690 S.E.2d 322

Hugh M. CAPERTON, Harman Development Corporation, Harman Mining Corporation, and Sovereign Coal Sales, Inc., Plaintiffs Below, Appellees,

v.

A.T. MASSEY COAL COMPANY, INC., Elk Run Coal Company, Inc., Independence Coal Company, Inc., Marfork Coal Company, Inc., Performance Coal Company, and Massey Coal Sales Company, Inc., Defendants Below, Appellants.

No. 33350.

Supreme Court of Appeals of West Virginia.

Submitted Following Remand Sept. 8, 2009.

Decided Nov. 12, 2009.

Dissenting Opinion of Justice Workman Nov. 30, 2009.

D.C. Offutt, Jr., Stephen Burchett, Randall L. Saunders, Ryan Q. Ashworth, Offutt, Fisher & Nord, Huntington, WV, for the Appellants.

Robert V. Berthold, Jr., Christina L. Smith, Berthold, Tiano & O'Dell, Charleston, WV, David B. Fawcett, Buchanan Ingersoll & Rooney, Pittsburgh, PA, for the Appellees, Harman Development Corporation, Harman

Mining Corporation, and Sovereign Coal Sales, Inc.

Bruce E. Stanley, Tarek F. Abdalla, Reed Smith LLP, Pittsburgh, PA, for the Appellee, Hugh M. Caperton.

Bradley J. Pyles, Pyles, Turner & Mick, LLP Logan, WV, for Amicus Curiae United Mine Workers of America.

DAVIS, Acting Chief Justice:

The Appellants herein and defendants below, A.T. Massey Coal Company, Inc., and various of its subsidiaries, appeal from a March 15, 2005, order entered in the Circuit Court of Boone County, which denied their post-judgment motions for judgment as a matter of law, a new trial, or remittitur, in response to the entry of a judgment of more than $50 million in favor of the appellees herein, and plaintiffs below, Hugh M. Caperton, Harman Development Corporation, Harman Mining Corporation, and Sovereign Coal Sales, Inc. In this appeal, A.T. Massey Coal Company and its subsidiaries allege numerous errors that purportedly occurred throughout the proceedings below.

This case is presently before this Court on remand from the United States Supreme Court.[1] Based upon our thorough consideration of the parties' arguments, the relevant case law, and the record on appeal, this Court concludes, based upon the existence of a forum-selection clause contained in a contract that directly related to the conflict giving rise to the instant lawsuit, that the circuit court erred in denying a motion to dismiss filed by A.T. Massey Coal Company and its subsidiaries. Accordingly, we reverse the judgment in this case and remand for the circuit court to enter an order dismissing, with prejudice, this case against A.T. Massey Coal Company and its subsidiaries.

## I.

### FACTUAL HISTORY

Central to the dispute underlying this appeal is the Harman Mine, an underground coal mine located in Buchanan County, Virginia, that produced very high quality metallurgical coal. Prior to 1993, the Harman Mine was owned by Inspiration Coal Corporation (hereinafter referred to as "Inspiration") through three subsidiaries: Harman Mining Corporation (hereinafter referred to as "Harman Mining"), Sovereign Coal Sales, Inc. (hereinafter referred to as "Sovereign"), and Southern Kentucky Energy Company (hereinafter referred to as "Southern"). For many years, all of the coal from the Harman Mine had been sold to Wellmore Coal Corporation (hereinafter referred to as "Wellmore"), a subsidiary of United Coal Corporation. In April 1992, Sovereign and Southern entered a coal supply agreement (hereinafter referred to as "the 1992 CSA") with Wellmore. Under the 1992 CSA, Wellmore was to purchase from Sovereign and Southern approximately 750,000 tons of coal per year for a period of ten years.

In 1993, Hugh M. Caperton (hereinafter referred to as "Mr. Caperton"), a plaintiff below and appellee herein, formed Harman Development Corporation[2] (hereinafter referred to as "Harman Development").[3] In that same year, Harman Development purchased the three previously mentioned sub-

---

1. The first opinion filed in connection with this appeal was vacated based upon the subsequent voluntary disqualification of two of the justices who participated in the earlier proceedings in this Court. A second opinion entered on rehearing was reversed by the United States Supreme Court based upon that Court's determination that an additional justice should have been disqualified. *See Caperton v. A.T. Massey Coal Co., Inc.,* —— U.S. ——, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). A detailed recitation of the complex procedural history of this case is set out in the body of this opinion at Section II, *infra.*

2. Harman Development Corporation is a Virginia corporation that has its principal place of business in Beckley, West Virginia.

3. Mr. Caperton had worked for Sovereign when it was a subsidiary of Inspiration. As Sovereign's employee, Mr. Caperton sold coal on behalf of Sovereign, including coal from the Harman Mine. Mr. Caperton left Sovereign to form his own coal brokerage company, Dominion Energy. Through Dominion Energy, Mr. Caperton continued to broker coal from the Harman Mine on behalf of Inspiration. In 1993, Dominion Energy became Harman Development Corporation.

sidiaries of Inspiration: Harman Mining,[4] Sovereign[5] and Southern, and thereby became the owner of the Harman Mine.[6] Harman Development, Harman Mining, and Sovereign are all plaintiffs to this action below, and are appellees herein (hereinafter collectively referred to as "the Harman Companies"). In 1997, in order to fund improvements to the Harman Mine, the Harman Companies sold all the Harman Mine reserves to Penn Virginia Corporation, and then leased back those reserves that could be mined in a cost-effective manner.

From the time the Harman Companies became owners of the Harman Mine until 1997, coal from the Harman Mine was purchased by Wellmore in accordance with the 1992 CSA. Prior to the expiration of the 1992 CSA, in March of 1997, a new CSA with a higher price per ton of coal (hereinafter referred to as "the 1997 CSA") was negotiated between Sovereign, Wellmore, and Harman Mining.[7] The 1997 CSA was to be in effect for a period of five years, commencing retroactively on January 1, 1997. It included, among other things, a *force majeure* clause,[8] and a forum-selection clause requiring that "[a]ll actions brought in connection with this Agreement shall be filed in and decided by the Circuit Court of Buchanan County, Virginia." [9]

During the course of the 1992 CSA, and at the time the 1997 CSA was executed, one of Wellmore's primary customers was LTV

**4.** Harman Mining is a Virginia corporation that transacts business in West Virginia and is a wholly-owned subsidiary of Harman Development.

**5.** Sovereign is a Delaware corporation that has its principal place of business in Beckley, West Virginia. Sovereign is a wholly-owned subsidiary of Harman Development.

**6.** The plan Harman Development established for the Harman Mine was to mine the reserves in a way that would allow convenient access to adjoining reserves owned by Pittston Coal Company. The appellees explain that it is commonplace in the mining industry for coal companies to sell or lease their properties to other operators when it makes economic sense to allow someone else to mine their coal. Due to the topography of the area, the Harman Mine provided better access to the Pittston reserves than Pittston itself had. Thus, Mr. Caperton hoped to one day lease the Pittston reserves. However, no lease agreement was ever executed between Pittston and any of the Harman Companies.

**7.** The 1997 CSA specified that Wellmore would purchase a minimum tonnage of coal, 573,000 tons per year, and also gave Wellmore the option to purchase all of the Harman Mine's production. Historically, Wellmore had purchased all of the coal that the Harman Mine produced.

**8.** The *force majeure* clause was nearly identical to one that had been included in the 1992 CSA, and stated, in relevant part,

[t]he term "force majeure" as used herein shall mean any and all causes reasonably beyond the control of SELLER or BUYER, as applicable, which cause SELLER or BUYER to fail to perform hereunder, such as, but not limited to, acts of God, acts of the public enemy, epidemics, insurrections, riots, labor disputes and strikes, government closures, boycotts, labor and material shortages, fires, explosions, floods, breakdowns or outages of or damage to coal preparation plants, equipment or facilities, interruptions or reduction to power supplies or coal transportation (including, but not limited to, railroad car shortages) embargoes, and acts of military or civil authorities, which wholly or partly prevent the mining, processing, loading and/or delivering of the coal by SELLER, or which wholly or partly prevent the receiving, accepting, storing, processing or shipment of the coal by BUYER.... Pertaining to BUYER, the term "force majeure" as used herein shall further include occurrence(s) of a force majeure event at any of BUYER's customer's plants and facilities, except that the effects of any such force majeure event shall not justify BUYER in reducing its purchase of coal hereunder in greater proportion than the coal to be purchased hereunder bears to all BUYER's sources of supply, including BUYER's own mines, for BUYER's metallurgical coal sold to domestic coke producers. SELLER and BUYER shall promptly notify the other following commencement of a force majeure. If because of a force majeure SELLER or BUYER, respectively, is unable to carry out its obligations under this Agreement and if such Party shall promptly give to the other Party written notice of such force majeure, then the obligations of the Party giving such notice and the corresponding obligations of the other Party shall be suspended to the extent made necessary by such force majeure and during its continuance; provided however, (i) that such obligations shall be suspended only to the extent made necessary by such force majeure and only during its continuance, and (ii) that the Party giving such notice shall act promptly in [sic] reasonable manner to eliminate such force majeure....

**9.** This forum-selection clause is identical to one that had been included in the 1992 CSA.

Steel (hereinafter referred to as "LTV"). Wellmore sold and shipped nearly two-thirds of the coal it purchased from the Harman Companies to LTV's coke plant located in Pittsburgh, Pennsylvania.[10] On July 19, 1997, LTV announced that it intended to close its Pittsburgh coke plant due to a change in emissions regulations promulgated by the Environmental Protection Agency.

A.T. Massey Coal Company (hereinafter referred to as "Massey"), a defendant below and appellant herein, had tried unsuccessfully for several years to sell its West Virginia mined coal directly to LTV.[11] Due to its lack of success in selling to LTV on its own, Massey determined to acquire LTV's supplier, Wellmore, and its parent corporation, United Coal Corporation (hereinafter referred to as "United").[12] Massey purchased Wellmore and United on July 31, 1997. Since there was no long-term agreement between LTV and Wellmore, Massey hoped to substitute its own coal for the Harman Mine coal that Wellmore had been supplying to LTV. An internal Massey memorandum admitted during trial revealed that Massey understood there were risks to its plan, most notably the possibility that the relationship between LTV and Wellmore might not continue under Massey ownership of Wellmore. The circuit court found that, in spite of this risk, and despite the knowledge that LTV was "extremely reluctant to change a long-established, successful coal blend" that included coal from the Harman Mine, Massey nevertheless "provided LTV with firm price quotes for coal mainly from Massey Mines, not Harman coal, and insisted that LTV make Massey its sole-source provider via a long-term coal contract." [13] As a conse-

quence of Massey's actions, LTV ceased buying coal from Wellmore. Thereafter, on August 5, 1997, Wellmore, at the direction of Massey, gave notice to the Harman Companies by letter stating that if LTV did in fact close its Pittsburgh plant, then Wellmore anticipated a pro rata reduction in tonnage under the *force majeure* clause of the 1997 CSA.

Subsequent to Wellmore's August 5th letter, Massey entered into negotiations with the Harman Companies for the purchase of the Harman Mine. During the course of these negotiations, confidential information regarding the Harman Mine's operations, including its desire to eventually mine adjoining Pittston reserves,[14] as well as confidential information pertaining to the finances of the Harman Companies and of Mr. Caperton, personally, was shared with Massey. The Harman Companies also expressed to Massey their disagreement that the LTV closure of its Pittsburgh coke plant constituted a *force majeure* event.

Thereafter, on December 1, 1997, Wellmore, at Massey's direction, declared *force majeure* based on LTV's closure of its Pittsburgh coke plant, and advised the Harman Companies that it would purchase only 205,-707 tons of the 573,000 minimum tons of coal required under the 1997 CSA. According to the express findings of the circuit court on this point,

> [o]nly after Massey's marketing efforts caused the loss of LTV's business did Massey direct Wellmore to declare "force majeure" against Harman, a declaration which Massey knew would put Harman out of

---

**10.** LTV purchased from Wellmore a premium blend of coal from the Harman Mine mixed with *other, lesser quality coals. The circuit court* expressly found that "[c]oal from the Harman Mine is metallurgical coal with very favorable coking characteristics prized by steelmakers like LTV."

**11.** This coal was inferior in quality to the coal obtained from the Harman Mine and sold to LTV through Wellmore.

**12.** The Harman Companies and Mr. Caperton presented evidence at trial to establish that Massey had for some time desired to sell coal to LTV, and opined that it was this desire that motivated

Massey's acquisition of Wellmore, and further motivated Massey to eliminate the Harman Companies *as its competitors via the destruction of* those companies.

**13.** Massey made these demands notwithstanding its knowledge that LTV had historically demonstrated a preference for multiple suppliers and had not entered multi-year coal supply contracts. Additionally, the firm price for its coal that Massey quoted to LTV represented "a handsome improvement" over the prices at which Massey had been selling its coal.

**14.** *See supra* note 6.

business. Massey acknowledged Wellmore was readily able to purchase and sell the Harman coal, but instead chose to have Wellmore declare "force majeure" based upon a cost benefit analysis Massey performed which indicated that it would increase its profits by doing so. Furthermore, before Massey directed the declaration of "force majeure", Massey concealed the fact that the LTV business was lost and Massey delayed Wellmore's termination of Harman's contract until late in the year, knowing it would be virtually impossible for Harman to find alternate buyers for its coal at that point in time. Once Wellmore suddenly stopped purchasing Harman's output, Harman had no ability to stay in business. In the meantime, Massey sold Wellmore.

Massey continued in negotiations with the Harman Companies and Mr. Caperton for Massey's purchase of the Harman Mine, and the parties agreed to close the transaction on January 31, 1998. However, Massey delayed and, as the circuit court found, "ultimately collapsed the transaction in such a manner so as to increase [the Harman Companies'] financial distress."[15] In addition, Massey utilized the confidential information it had obtained from the Harman Companies to take further actions, such as purchasing a narrow band of the Pittston coal reserves surrounding the Harman Mine in order to make the Harman Mine unattractive to others and thereby decrease its value. During the negotiations for the sale of the Harman Mine to Massey, Massey had also learned that Mr. Caperton had personally guaranteed a number of the Harman Companies' obligations.[16] Subsequently, the Harman Companies filed for bankruptcy.

Thereafter, in May 1998, Harman Mining and Sovereign sued Wellmore in the Circuit Court of Buchanan County, Virginia, alleging causes of action for breach of contract and for breach of the covenant of good faith and fair dealing arising from Wellmore's declaration of *force majeure.* However, Harman Mining and Sovereign voluntarily withdrew their tort claim prior to trial. Following trial on the contract claim, a jury found in favor of Harman Mining and Sovereign and awarded $6 million in damages.[17]

## II.

## PROCEDURAL HISTORY

Shortly after the Virginia action was filed, on October 29, 1998, Harman Development, Harman Mining, Sovereign and Mr. Caperton, individually, filed the instant action in the Circuit Court of Boone County, West Virginia, against A.T. Massey Coal Company, Inc., Elk Run Coal Company, Inc., Independence Coal Company, Inc., Mar Fork Coal Company, Inc., Performance Coal Company, and Massey Coal Sales Company, Inc. (hereinafter collectively referred to as "the Massey Defendants").[18] The first amended complaint in this action was filed on December 10, 1998, and asserted claims of tortious interference with existing contractual rela-

---

**15.** According to testimony presented at trial, during the negotiations of Massey's potential purchase of the Harman Mine, Massey represented that it would assume the Harman coal reserves lease from Penn Virginia "as-is." However, just prior to the scheduled closing of Massey's purchase of the Harman Mine, Massey demanded changes to numerous material terms of the Harman Companies' lease agreement with Penn Virginia. Massey and Penn Virginia could not agree on terms; therefore, Massey's purchase of the Harman Mine was never completed.

**16.** Mr. Caperton had personal obligations to Inspiration Coal (now known as Terra Industries), Senstar Financial, Grundy National Bank, and Vision Financial, among others. The circuit court expressly found that many of the steps Massey took were directed at Mr. Caperton personally, and that Mr. Caperton had relied to his

detriment on numerous false representations made by Massey. One example of such false representations made by Massey was that it lead Mr. Caperton to believe that it intended to close its purchase of the Harman Mine on January 31, 1998, when, in fact, Massey had already determined not to close the transaction.

**17.** Wellmore appealed the verdict to the Supreme Court of Virginia; however, the appeal was refused on technical grounds. *See Wellmore Coal Corp. v. Harman Mining Corp.,* 264 Va. 279, 568 S.E.2d 671 (2002).

**18.** Elk Run Coal Company, Inc., Independence Coal Company, Inc., Mar Fork Coal Company, Inc., Performance Coal Company, and Massey Coal Sales Company, Inc., are all subsidiaries of A.T. Massey Coal Company, Inc.

tions, tortious interference with prospective contractual relations, fraudulent misrepresentation, civil conspiracy, negligent misrepresentation, and punitive damages. Though numerous pre-trial motions were filed in the underlying action, one in particular is relevant to our resolution of this matter: in December 1998, the Massey Defendants filed a motion to dismiss. In their memorandum in support of the motion, the Massey Defendants argued, *inter alia*, that the forum-selection clause of the 1997 CSA required this action to be filed in Buchanan County, Virginia. The circuit court denied the Massey Defendants' motion to dismiss.

Ultimately, only three of the theories of liability asserted in this action were presented to the jury for a verdict:[19] tortious interference, fraudulent misrepresentation and fraudulent concealment. On August 1, 2002, the jury found in favor of all plaintiffs on all three grounds and returned a verdict, including punitive damages, of $50,038,406.00. On August 30, 2002, the Massey Defendants filed a motion seeking judgment as a matter of law, a new trial, or, in the alternative, remittitur. Following a lengthy delay, by order entered March 17, 2005, the circuit court denied the post-trial motions. An appeal to this Court followed.[20]

On November 21, 2007, this Court handed down its written opinion reversing the judgment of the circuit court and remanding for entry of an order dismissing with prejudice the case against the Massey Defendants.[21] Subsequently, two of the justices who had participated in deciding the appeal voluntarily disqualified themselves, two circuit court judges were designated to sit on this Court by temporary assignment for the purpose of deciding the case on rehearing, and the November 21, 2007, opinion of the Court was vacated. The case was submitted on rehearing on March 12, 2008, and the Court's opinion, again reversing the judgment of the circuit court and remanding for entry of an order dismissing with prejudice the case against the Massey Defendants, was filed on April 3, 2008.[22]

Thereafter, Mr. Caperton and the Harman Companies filed a petition for writ of certiorari in the United States Supreme Court asserting that acting Chief Justice Benjamin's refusal to grant their motions seeking his disqualification amounted to a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[23] The Supreme Court granted the petition on November 14, 2008. Thereafter, by a five-four decision,[24] the Supreme Court reversed and remanded the case concluding that Justice Benjamin's participation in the decision of this case created an "unconstitutional 'potential for bias.'" *Caperton v. A.T. Massey Coal Co., Inc.,* —— U.S. ——, ——, 129 S.Ct. 2252, 2262, 173 L.Ed.2d 1208 (2009) (see opinion for factual details regarding the issue of Justice Benjamin's disqualification).

Following the reversal of this case by the United States Supreme Court, the Harman Companies and Mr. Caperton filed in this Court motions seeking, in part, "affirmance

---

**19.** The punitive damages claim was presented also.

**20.** There were additional delays in this case involving the trial transcript. The circuit court certified the transcript on August 25, 2006. The appeal was then filed on October 24, 2006.

**21.** The justices who were sitting on the Court and initially participated in the decision of this case were: Chief Justice Robin Jean Davis, Justice Larry V. Starcher, Justice Elliott E. Maynard, Justice Joseph P. Albright, and Justice Brent D. Benjamin. Justices Starcher and Albright dissented from the decision of the Court.

**22.** The justices who participated in the decision of this case on rehearing were: Chief Justice Brent D. Benjamin, Justice Robin Jean Davis, Justice Joseph P. Albright, Judge Donald H. Cookman, sitting by temporary assignment, and Judge Fred L. Fox, II, sitting by temporary assignment. Justice Albright and Judge Cookman dissented from the decision of the Court.

**23.** Prior to the filing of the petition for appeal in this matter, Mr. Caperton filed a motion seeking Justice Benjamin's disqualification, in part, on due process grounds. After the petition was filed, Mr. Caperton and the Harman Companies filed additional motions seeking Justice Benjamin's disqualification on October 19, 2005, January 17, 2008, and March 28, 2008.

**24.** The dissenting justices were: Chief Justice John G. Roberts, Jr., Justice Antonin Scalia, Justice Clarence Thomas, and Justice Samuel A. Alito, Jr.

of judgment or, in the alternative, for reconsideration and denial of the petition for appeal."[25] This Court denied the motions and, on September 9, 2009, oral argument was heard anew in this matter.[26]

## III.

### STANDARD OF REVIEW

■■■ The dispositive issue in this case is whether the circuit court erred in denying the Massey Defendants' motion to dismiss on the issue of the forum-selection clause. "Courts generally consider a motion to dismiss, based upon a forum selection clause, as a motion to dismiss for improper venue." Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure*, § 12(b)(3)[5] at 376 (2d ed.2006). "This Court's review of a trial court's decision on a motion to dismiss for improper venue is for abuse of discretion." Syl. pt. 1, *United Bank, Inc. v. Blosser*, 218 W.Va. 378, 624 S.E.2d 815 (2005).

■■■ In deciding this issue, we must first determine the applicability and enforceability of the forum-selection clause at issue. In this regard, we now hold that "[o]ur review of the applicability and enforceability of [a] forum[-]selection clause is *de novo*." *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 207 (7th Cir.1993) (citing *Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 375 (7th Cir. 1990); *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 956 (10th Cir. 1992)). *Cf.* Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.").

With due consideration for these standards, we proceed to our analysis of this case.

## IV.

### DISCUSSION

#### A. *Motion for Affirmance or Reconsideration of Petition for Appeal*

Prior to reaching the merits of this appeal, we wish to address an issue that developed as a result of the disqualification of Justice Benjamin from this case. In motions filled in this Court following the reversal of the case by the United States Supreme Court, the Harman Companies and Mr. Caperton sought, in relevant part, "affirmance of judgment or, in the alternative, for reconsideration and denial of the petition for appeal." Although this Court denied the motions by order entered September 3, 2009, we nevertheless wish to discuss our grounds for so doing, and to establish a clear procedure to be applied in the event that similar circumstances arise in the future.

In their motions, Mr. Caperton and the Harman Companies argued, in part, that the jury verdict should be affirmed, because the disqualification ruling by the United States Supreme Court left the case with a non-majority split vote of two-two. In denying the motion, this Court explained in its Order of September 3, 2009, that

> by [asking this Court to] retroactively impose[ ] a tie vote, the Corporate Appellees [Mr. Caperton and the Harman Companies], in a manner contrary to well-accepted principles of appellate procedure, seek . . . to constrain this Court's discretion to proceed on remand. Plainly stated, this Court has not yet reached a final decision

---

25. The motions by Mr. Caperton and the Harman Companies additionally sought to have this Court order the Massey Defendants to post an appeal bond in the amount of eighty-five million dollars. In denying the motion, this Court, in its Order dated September 3, 2009, noted that "the Order of the circuit court entered July 17, 2003, [which directed the Massey Defendants to post surety in the amount of Fifty–Five Million Dollars,] remains in full force and effect." Accord-

ingly, this Court directed the appellants to "comply with the circuit court's order forthwith."

26. The justices currently sitting on the Court to decide the instant case are: Acting Chief Justice Robin Jean Davis, Justice Margaret L. Workman, Justice Menis E. Ketchum, Justice Thomas E. McHugh, and Senior Status Judge James O. Holliday, sitting by temporary assignment.

in this matter and therefore cannot be equally divided.

In addition, we note that the motion was properly denied based upon the reasoning used by the United States Supreme Court in *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986).

In Aetna Life, the United States Supreme Court addressed the issue of whether an Alabama Supreme Court Justice should have recused himself from the case. The United States Supreme Court concluded that the justice was disqualified and should have recused himself. As a result of the disqualification of the justice, the vote in the case became four-four. The United States Supreme Court determined that the opinion by the Alabama Supreme Court could not survive because of the four-four decision. Consequently, the Alabama Supreme Court decision was vacated and the case was remanded for further proceedings. The opinion in *Aetna Life* cited the following procedure that was used by Alabama when a justice was disqualified:

> If Justice Embry had disqualified himself, the decision of the trial court would not have been affirmed by a vote of an equally divided court. Rather, Ala.Code § 12–2–14 (1975), which authorizes the appointment of special justices in the event disqualifications result in an even-numbered court which is evenly divided on a matter, would presumably have come into play.

*Aetna Life*, 475 U.S. at 828 n. 5, 106 S.Ct. at 1589 n. 5. After the case was remanded, the matter was reheard by the Alabama Supreme Court and that Court once again affirmed the verdict for the plaintiff. *See Aetna Life Ins. Co. v. Lavoie*, 505 So.2d 1050 (Ala.1987).

Thus, Aetna Life stands for the proposition that, when the United States Supreme Court disqualifies a state court justice, and such disqualification leaves an equally divided state court, the case must be remanded for appointment of a new judge as provided by state law.

West Virginia does not have a statute that expressly addresses the issue of the disqualification of a justice. However, the disqualification issue is addressed in our state constitution and rules of appellate procedure. Under Art. VIII, § 2 of the West Virginia Constitution, it is stated that "[w]hen any justice is temporarily disqualified or unable to serve, the chief justice may assign a judge of a circuit court or of an intermediate appellate court to serve from time to time in his stead." It is further provided in Rule 29(g) of the Rules of Appellate Procedure that:

> When any justice shall disqualify himself or herself pursuant to the provisions of this rule, the chief justice or acting chief justice may, in his or her discretion, assign a senior justice, senior judge, or circuit judge to service for the disqualified justice. The chief justice shall promptly notify the Clerk of the Supreme Court of his or her decision regarding the necessity of the appointment of a substitute justice and the Clerk of the Supreme Court shall promptly notify the other justices and the parties of such decision.

■ Thus, in accordance with our state constitution, our rules of appellate procedure, and the United States Supreme Court's decision in *Aetna Life Ins. Co. v. Lavoie*, we now expressly hold that, where the disqualification of a Justice of this Court, either by decision of the United States Supreme Court or by his or her personal decision made after an opinion has been issued by this Court, renders the decision of this Court a tie vote, then the Chief Justice or Acting Chief Justice of this Court may, in his or her discretion, assign a senior justice, senior judge, or circuit judge to serve in the place of the disqualified justice pursuant to Art. VIII, § 2 of the West Virginia Constitution and Rule 29(g) of the West Virginia Rules of Appellate Procedure.

The motions by Mr. Caperton and the Harman Companies additionally asked, in the alternative, that this Court reconsider its prior decision to grant Massey's petition for appeal. This motion was also denied in this Court's order of September 3, 2009, wherein the Court observed that "[b]ecause it lacks specific directions about how to proceed, the opinion of the Supreme Court of the United

States constitutes a general—rather than a limited—remand." (Citing Syl. pt. 2, in part, *State ex rel. Frazier & Oxley v. Cummings,* 214 W.Va. 802, 591 S.E.2d 728 (2003)) ("Limited remands explicitly outline the issues to be addressed by the [lower] court and create a narrow framework within which the [lower] court must operate. General remands, in contrast, give [lower] courts authority to address all matters so long as remaining consistent with the remand."). This Court went on to explain that, "[e]ven if this Court were obliged to reconsider whether the petition for appeal should be granted, it is plain from the record that this case presents several points that are proper for the consideration of this Court, and that the appeal was properly allowed." (Citing W. Va. Const. Art. VIII, sec. 4).

### B. Forum–Selection Clause

Although numerous issues have been raised on appeal in this case, we find that the instant matter may be resolved on the issue of the forum-selection clause contained in the 1997 CSA between Sovereign Coal Sales, Inc., Wellmore Coal Corporation, and Harman Mining Corporation.

■ The 1997 CSA between Sovereign, Wellmore, and Harman Mining provided that the "[a]greement, in all respects, shall be governed, construed and enforced in accordance with the substantive laws of the Commonwealth of Virginia. All actions brought in connection with this Agreement shall be filed in and decided by the Circuit Court of Buchanan County, Virginia...." In the proceeding below, the Massey Defendants filed a motion to dismiss alleging, in relevant part, that the forum-selection clause in the 1997 CSA required that any action related to that agreement be brought in the Circuit Court of Buchanan County, Virginia. Accordingly, the Massey Defendants argued that the action was improperly before the Circuit Court of Boone County, West Virginia, and that the instant action should therefore be dismissed.[27] The circuit court denied the motion to dismiss.

■ This case presents the first opportunity for this Court to address substantive issues involving forum-selection clauses. By way of definition, it has been recognized that "[a] 'forum selection' provision in a contract designates a particular state or court as the jurisdiction in which the parties will litigate disputes arising out of the contract and their contractual relationship." 17A Am.Jur.2d *Contracts* § 259, at 255 (2004) (footnote omitted). While forum-selection clauses historically were disfavored, such is no longer the case, so long as the clause is fair and reasonable:

> The right of an injured party to legal redress is jealously guarded by the courts. Formerly, no agreement confining the right of a party to sue in a particular court or tribunal or in the courts or tribunals of a certain jurisdiction, or to determine the venue of a suit in such a way as to deprive the defendant of his statutory privileges as to place of trial was enforced, unless perhaps where the agreement was made after the cause of action had arisen and was part of a fair compromise. A minority of courts still follow this older rule.

> During the past two decades, the rules governing the validity of various "forum selection" clauses have been relaxed considerably, the courts following a pattern similar to that which has already been discussed in connection with arbitration clauses. Thus, while it remains true today that a clause or provision *unreasonably or improperly* attempting to deprive a court of its jurisdiction will not be enforced, the modern trend is to respect the enforceability of contracts containing clauses limiting judicial jurisdiction, if there is nothing unfair or unreasonable about them. This trend is directly traceable to the landmark case of *M/S Bremen v. Zapata Off–Shore Co.,* [407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)], in which the United States Supreme Court upheld the validity of a freely negotiated forum selection clause in a commercial contract between an American firm and a German concern, which

27. "A motion to dismiss is the proper procedural mechanism for enforcing a forum-selection clause that a party to the agreement has violated

in filing suit." *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.,* 234 S.W.3d 679, 687 (Tex.App.2007) (citations omitted).

specified that any dispute must be determined by the English courts....

7 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 15:15, at 290–301 (4th ed.1997) (footnotes omitted). *See also* 17A Am.Jur.2d *Contracts* § 259, at 255–56 ("While there is contrary authority, generally modern courts will enforce forum-selection clauses entered into by parties to a contract provided that the clauses are not unfair, unreasonable, or unjust under [the] circumstances." (footnotes omitted)).

■ Although this Court has not had occasion to address substantive issues involving forum-selection clauses, we have previously indicated our general approval of forum-selection clauses by noting that they are not contrary to public policy:

Unquestionably, forum selection clauses are not contrary to public policy in and of themselves for they are sanctioned in commercial sales agreements under W. Va. Code § 46–1–105(2). Although an early case in our jurisprudence held void a clause in a stock certificate requiring that stockholders bring suit in New York, *Savage v. People's Building, Loan and Savings Association*, 45 W.Va. 275, 31 S.E. 991 (1898), later cases have sanctioned, at least implicitly, forum selection clauses. *Axelrod v. Premier Photo Service, Inc.*, 154 W.Va. 137, 173 S.E.2d 383 (1970). *Board of Education v. W. Harley Miller, Inc.*, 159 W.Va. 120, 221 S.E.2d 882 (1975)....

As the Federal court observed, West Virginia appears not to subscribe to the rule that choice of forum clauses are void per se. "Rather the rule of most jurisdictions and the rule that this Court believes that West Virginia should and would adopt is that such clauses will be enforced only when found to be reasonable and just". *Leasewell, Ltd. v. Jake Shelton Ford Inc.*, 423 F.Supp. 1011, 1015 (S.D.W.Va.1976). *See also, Kolendo v. Jarell, Inc.*, 489 F.Supp. 983 (S.D.W.Va.1980).

*General Elec. Co. v. Keyser*, 166 W.Va. 456, 461–62 n. 2, 275 S.E.2d 289, 292–93 n. 2 (1981). *See also* Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 12(b)(3)[5], at 376–77 (2d ed.2006) (hereinafter referred to as "*Litigation Handbook*") ("The Supreme Court has indicated in passing that forum selection clauses are not contrary to public policy." (citing *General Electric Co. v. Keyser*)).

Having found no impediment to the enforcement of forum-selection clauses in general, we now must endeavor to specifically determine whether the forum-selection clause of the 1997 CSA should have been enforced in the instant case.

■ In *Phillips v. Audio Active Limited*, 494 F.3d 378 (2d Cir.2007), the United States Court of Appeals for the Second Circuit articulated a four-part test for determining whether a claim should be dismissed based upon a forum-selection clause. We find this test supported by reason and logic, and by the manner in which such cases have been resolved in other courts; therefore, we now hold that

[d]etermining whether to dismiss a claim based on a forum[-]selection clause involves a four-part analysis. The first inquiry is whether the clause was reasonably communicated to the party resisting enforcement.... The second step requires [classification of] the clause as mandatory or permissive, *i.e.*, ... whether the parties are *required* to bring any dispute to the designated forum or [are] simply *permitted* to do so. [The third query] asks whether the claims and parties involved in the suit are subject to the forum selection clause....

If the [forum-selection] clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable.... The fourth, and final, step is to ascertain whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that "enforcement would be unreasonable [and] unjust, or that the clause was invalid for such reasons as fraud or overreaching."

*Phillips*, 494 F.3d at 383–84 (internal citations omitted) (quoting *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15, 92 S.Ct.

1907, 1916, 32 L.Ed.2d 513 (1972)). *See also Dexter Axle Co. v. Baan USA, Inc.*, 833 N.E.2d 43, 49 (Ind.Ct.App.2005) ("Having found that the forum selection clause in the Consulting Agreement is valid, binding, and enforceable, we must next consider whether it applies to any or all of Dexter's claims against Baan."); *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.*, 234 S.W.3d 679, 687 (Tex.App.2007) ("In deciding whether to enforce a mandatory forum-selection clause, courts must determine whether the claims in the case at hand fall within the scope of the forum-selection clause and whether the court should enforce the clause. In addition to resolving issues of scope and enforceability, courts also may have to decide issues as to whether nonsignatories to the contract can enforce the forum-selection clause contained therein."). We now follow this analysis to ascertain whether the instant case should have been dismissed pursuant to the forum selection clause.

### 1. Reasonably Communicated.

The first question we must answer is whether the forum-selection clause was reasonably communicated to Mr. Caperton and the Harman Companies. "Although a strong presumption of enforceability attaches to forum selection clauses, *see M/S Bremen*, 407 U.S. at 15, 92 S.Ct. 1907, '[t]he legal effect of a forum-selection clause depends in the first instance upon whether its existence was reasonably communicated to the plaintiff....' " *Electroplated Metal Solutions, Inc. v. American Servs., Inc.*, 500 F.Supp.2d 974, 976 (N.D.Ill.2007) (internal citation omitted) (quoting *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir.1995)). *See also* 17A C.J.S. Contracts § 237, at 211 (1999) ("A forum selection clause is unenforceable as to a plaintiff who did not have sufficient notice of the forum selection clause prior to entering the contract.").

This prong of the analysis is easily resolved as Mr. Caperton and the Harman Companies have not argued that the forum-selection clause was not reasonably communicated to them. Furthermore, Sovereign and Harman Mining were parties to the agreement, and Mr. Caperton signed the contract in his capacity as president of Sovereign.

Therefore, these parties cannot claim ignorance of the plainly worded forum-selection clause, which "clearly convey[ed] to any reader that any action regarding the [CSA] must be brought in a specific court, and the location of that court [was] readily ascertainable...." *Klotz v. Xerox Corp.*, 519 F.Supp.2d 430, 433 (2007). Moreover, though Harman Development, the parent company of Sovereign and Harman Mining, was not a party to the 1997 CSA, Mr. Caperton is the sole owner of Harman Development. Since Mr. Caperton had knowledge of the clause, Harman Development is deemed to have knowledge of the clause. *See Clark v. Milam*, 192 W.Va. 398, 402, 452 S.E.2d 714, 718 (1994) ("Generally, a corporation 'knows,' or 'discovers,' what its officers and directors know."). Thus, we find sufficient evidence in the record of this case to establish that the forum-selection clause was reasonably communicated to those who now resist its application.

### 2. Mandatory or Permissive.

The second step in our analysis is to determine whether the forum-selection clause is mandatory or permissive. It has been widely recognized, and we now expressly hold that "[t]here are two types of forum[-]selection clauses: mandatory and permissive. A mandatory forum[-]selection clause contains clear language indicating that jurisdiction is appropriate only in a designated forum. A permissive forum[-]selection clause authorizes litigation in a designated forum, but does not prohibit litigation elsewhere." Litigation Handbook § 12(b)(3)[5], at 376 (footnote omitted) (citing *K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW")*, 314 F.3d 494 (10th Cir. 2002)). *See also Weisser v. PNC Bank, N.A.*, 967 So.2d 327, 330 (Fla.Dist.Ct.App.2007) (" 'Permissive [forum selection] clauses constitute nothing more than a consent to jurisdiction and venue in the named forum and do not exclude jurisdiction or venue in any other forum.' ... In contrast, mandatory forum selection clauses provide 'for a mandatory and exclusive place for future litigation.' " (citations omitted)); *Great N. Ins. Co. v. Constab Polymer–Chemie GmbH & Co.*, No. 5:01–CV–0882 (NAM)(GJD), 2007 WL 2891981, at *8 (N.D.N.Y.2007) ("A mandatory

forum selection clause grants exclusive jurisdiction to a selected forum and should control absent a strong showing that it should be set aside.... In contrast, 'a permissive forum selection clause indicates the contracting parties' consent to resolve their dispute in a given forum, but does not require the dispute to be resolved in that forum ....' " (internal citations omitted)).

Resolution of the question of whether a forum-selection clause is mandatory or permissive requires scrutiny of the particular language used.

In determining whether a forum selection clause is mandatory or permissive, the language of the clause must be examined. For example, in *Quinones*, the Florida Supreme Court found that the forum selection clause was permissive, not mandatory, because it provided that the creditor **"may"** institute legal proceedings in specified courts, not that it **"shall"** do so. [*Quinones v. Swiss Bank Corp. (Overseas), S.A.*, 509 So.2d 273, 275 (Fla.1987)] (emphasis added).... "Conversely forum selection clauses which state or clearly indicate that any litigation **must** or **shall** be initiated in a specified forum are mandatory." *Shoppes Ltd.* [*P'ship v. Conn*, 829 So.2d 356, 358 (Fla.Dist.Ct.App.2002)] (emphasis added) (citing *Mgmt. Computer Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So.2d 627 (Fla. 1st DCA 1999)). *Weisser*, 967 So.2d at 330. The *Weisser* Court also cited *Regal Kitchens, Inc. v. O'Connor & Taylor Condominium Construction, Inc.*, 894 So.2d 288, 290 (Fla.Dist.Ct. App.2005), wherein the court examined a forum-selection clause which stated that "[a]ny litigation concerning this contract shall be governed by the law of the State of Florida, *with proper venue in Palm Beach County.*" (Emphasis added). The *Regal Kitchens* Court observed that the clause was mandatory as to the law to be applied, but permissive as to the forum, commenting that,

> [i]n the instant case, although the venue clause unequivocally states that Florida law shall apply to any litigation of the subcontract, it lacks mandatory language or words of exclusivity to show that venue is proper only in Palm Beach County. *See*

*Shoppes Ltd. P'ship v. Conn.* [*Conn* ], 829 So.2d at 357–58. That is to say, this clause does not unequivocally mandate that a controversy or dispute be litigated in Palm Beach County, nor does it waive any other territorial jurisdiction. The language merely allows a party to file suit in Palm Beach County.

894 So.2d at 291–92.

 Thus, to be enforced as mandatory, a forum-selection clause must do more than simply mention or list a jurisdiction; in addition, it must either specify venue in mandatory language, or contain other language demonstrating the parties' intent to make jurisdiction exclusive.

A forum selection clause is mandatory if jurisdiction and venue are specified with mandatory or exclusive language. *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imp. & Distribs., Inc.*, 22 F.3d 51, 53 (2d Cir.1994). In *Boutari*, the Second Circuit held that "[t]he general rule in cases containing forum selection clauses is that [w]hen only jurisdiction is specified the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive." *Boutari*, 22 F.3d at 52....

*Great N. Ins. Co.*, 2007 WL 2891981, at *8 (additional citations omitted). *See also K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW")*, 314 F.3d 494, 499 (10th Cir.2002) (" '[W]here venue is specified [in a forum-selection clause] with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified [in a forum-selection clause], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive.' " (quoting *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir.1992))). *See also Printing Servs. of Greensboro, Inc. v. American Capital Group, Inc.*, 180 N.C.App. 70, 637 S.E.2d 230, 232 (2006) (" '[T]he general rule is when a jurisdiction is specified in a provision of contract, the provision generally will not be enforced as a mandatory selection clause without some further language that indicates the parties'

intent to make jurisdiction exclusive. Indeed, mandatory forum selection clauses recognized by our appellate courts have contained words such as "exclusive" or "sole" or "only" which indicate that the contracting parties intended to make jurisdiction exclusive.' " (quoting *Mark Group Int'l, Inc. v. Still,* 151 N.C.App. 565, 566 S.E.2d 160, 161 (2002))).

An example of a case illustrating a forum-selection clause that used mandatory language is *Docksider, Ltd. v. Sea Technology, Ltd.,* 875 F.2d 762 (9th Cir.1989). In that case, the plaintiff entered into a contract with the defendant to distribute equipment manufactured by the defendant. The contract contained a forum-selection clause that included the following pertinent language: "Licensee hereby agrees and consents to the jurisdiction of the courts of the State of Virginia. Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia." *Docksider,* 875 F.2d at 763. A dispute arose over the contract that resulted in the plaintiff filing an action against the defendant in a federal district court in California. The district court dismissed the action, finding that the forum-selection clause required the case be filed in a Virginia court. The plaintiff appealed, arguing that the forum-selection clause was permissive, not mandatory. The Court of Appeals for the Ninth Circuit disagreed with the plaintiff, ruling as follows:

The critical language in [the clause] is the final sentence: "Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia." The district judge concluded that this language represented the parties' intent to pursue any litigation that arose only in Virginia. [Plaintiff] contends that this interpretation is erroneous because the contractual language does not contain any express mandatory term such as "exclusively" that would indicate the parties' intent to vest Virginia with exclusive jurisdiction.

[Plaintiff] has cited numerous cases as support for this position, relying principally on *Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75 (9th Cir.1987).

. . . .

*Hunt Wesson* is distinguishable because the forum selection clause underlying this action contains the additional sentence stating that "[v]enue of any action brought hereunder shall be deemed to be in ... Virginia." This language requires enforcement of the clause because [plaintiff] not only consented to the jurisdiction of the state courts of Virginia, but further agreed by mandatory language that the venue for all actions arising out of the license agreement would be Gloucester County, Virginia. This mandatory language makes clear that venue, the place of suit, lies exclusively in the designated county. Thus, whether or not several states might otherwise have jurisdiction over actions stemming from the agreement, all actions must be filed and prosecuted in Virginia.

*Docksider,* 875 F.2d at 763–64.

■ In accordance with the foregoing authorities, we now hold that the determination of whether a forum-selection clause is mandatory or permissive requires an examination of the particular language contained therein. If jurisdiction is specified with mandatory terms such as "shall," [28] or exclusive terms such as "sole," "only," or "exclusive," the clause will be enforced as a mandatory forum-selection clause. However, if jurisdiction is not modified by mandatory or exclusive language, the clause will be deemed permissive only.

■ Turning to the instant case, the forum-selection clause utilized mandatory language that identified the jurisdiction wherein disputes would be tried: "[a]ll actions brought in connection with this Agreement *shall* be filed in and decided by the Circuit Court of Buchanan County, Virginia." (Emphasis added). Accordingly, we are present-

**28.** This Court has often recognized that " '[i]t is well established that the word "shall," in the absence of language ... showing a contrary intent ..., should be afforded a mandatory connotation.' " Syl. pt. 1, in part, *E.H. v. Matin,* 201 W.Va. 463, 498 S.E.2d 35 (1997) (internal cita-

tion omitted). *See also State v. Allen,* 208 W.Va. 144, 153, 539 S.E.2d 87, 96 (1999) ("Generally, 'shall' commands a mandatory connotation and denotes that the described behavior is directory, rather than discretionary." (citations omitted)).

ed with a mandatory forum-selection clause. *See Ex parte Bad Toys Holdings, Inc.*, 958 So.2d 852, 856 (Ala.2006) ("The forum-selection clause in the purchase agreement provides that '[v]enue for any legal action which may be brought hereunder *shall* be deemed to lie in Sullivan County, Tennessee' (emphasis added). The ... use of the word 'shall' in the forum-selection clause makes the clause mandatory, not permissive."); *Town of Homer v. United Healthcare of Louisiana, Inc.*, 948 So.2d 1163, 1167 (La.Ct.App.2007) ("We find the forum selection clause at issue to be clear and explicit. The clause expressly states that the proper venue for *any legal action shall* be East Baton Rouge Parish. There is no ambiguity in this mandatory provision."); *Polk County Recreational Ass'n v. Susquehanna Patriot Commercial Leasing Co., Inc.*, 273 Neb. 1026, 734 N.W.2d 750, 758 (2007) ("The forum selection clause in the Thornridge lease provides that any action concerning the lease 'shall be' brought in Pennsylvania. We read this forum selection clause to be a mandatory clause...."); *General Elec. Co. v. G. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1099 (6th Cir.1994) ("Because the clause states that 'all' disputes 'shall' be at Siempelkamp's principal place of business, it selects German court jurisdiction exclusively and is mandatory."). Having determined that the forum-selection clause at issue in this case is a mandatory clause, we must now determine whether the claims and parties involved in the suit are governed by said clause.

3. **Claims and Parties.** The third part of our analysis is to determine whether the claims and parties involved in the suit are governed by the forum-selection clause. We address these questions separately.

a. **Are the claims asserted in the instant suit subject to the forum-selection clause?**[29] Mr. Caperton and the Harman Companies have argued that the claims asserted in this action are not governed by the forum-selection clause because they are tort, as opposed to contract, claims. We disagree.

■ It has been recognized that,

[w]hen a party seeks to enforce a mandatory forum-selection clause, a court must determine whether the claims in question fall within the scope of that clause.... The court bases this determination on the language of the clause and the nature of the claims that are allegedly subject to the clause.

*Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.*, 234 S.W.3d 679, 687–88 (Tex.App.2007) (citing *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 221–22 (5th Cir.1998)). *See also Phillips v. Audio Active Ltd.*, 494 F.3d 378, 388 (2d Cir.2007) ("[W]hen ascertaining the applicability of a contractual provision to particular claims, we examine the substance of those claims, shorn of their labels."). Accordingly, we expressly hold that, to determine whether certain claims fall within the scope of a mandatory forum-selection clause, the deciding court must base its determination on the language of the clause and the nature of the claims that are allegedly subject to the clause.

■ Turning to the case at hand, we must first examine the language of the mandatory forum-selection clause at issue. Because the 1997 CSA expressly states that it "shall be ... construed ... in accordance with the substantive laws of the Commonwealth of Virginia," we will scrutinize the language of the clause pursuant to Virginia law. Notably, under Virginia law, "[w]ritten contracts are construed as written, without adding terms that were not included by the parties. When the terms in a contract are

---

**29.** At the outset of this issue, we point out that, because the forum-selection clause issue was addressed by the circuit court in the context of the Massey Defendants' motion to dismiss, this Court is constrained to address the claims as they were asserted in the amended complaint. This is because the amended complaint represents the record that was before the circuit court at the time of its ruling on the Massey Defendants' motion to dismiss. Although facts pertaining to the claims asserted in the amended complaint were further developed during the course of the trial, such facts are not proper for our consideration on review of this issue. *See, e.g., Powderidge Unit Owners Ass'n v. Highland Props., Ltd.*, 196 W.Va. 692, 700, 474 S.E.2d 872, 880 (1996) ("To be clear, our review is limited to the record as it stood before the circuit court at the time of its ruling.").

plain and unambiguous, the contract is construed according to its plain meaning. The words that the parties used are normally given their usual, ordinary and popular meaning." *Heron v. Transportation Cas. Ins. Co.*, 274 Va. 534, 650 S.E.2d 699, 702 (2007).

The forum-selection clause of the 1997 CSA states in plain language that it applies to "[a]ll actions brought in connection with this Agreement." Due to the inclusion of the phrase "all actions," we perceive no intent by the parties to this agreement to limit in any way the type of actions to which it applies. Thus, for example, it would apply equally to contract claims, tort claims, and statutory claims, so long as such claims are "brought in connection with" the 1997 CSA.

Considering next the "usual, ordinary and popular meaning" of the phrase "in connection with," we find the intended scope of the forum-selection clause to be quite broad. *Heron*, 650 S.E.2d at 702. The word "connection" in the context herein used, is generally understood to mean "[t]he condition of being related to something else by a bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in another." II The Oxford English Dictionary 838–39 (1970 re-issue). *See also* Random House Webster's Unabridged Dictionary 431–32 (2d ed.1998) (defining "connection" in part as "association; relationship ..."); Webster's Third New International Dictionary 481 (1993) (defining "connection" in relevant part as "the state of being connected or linked ... relationship or association in thought (as of cause and effect, logical sequence, mutual dependence or involvement)"). Thus, so long as the claims asserted in this action bear a logical relationship to the 1997 CSA, they fall within its scope, regardless of whether they sound in contract, tort, or some other area of the law.

Other courts considering forum-selection clauses that contained broad language such as that used in the instant clause have similarly determined that the clauses were not intended to apply merely to breach of contract claims, but rather were intended to apply to other claims as well. For example,

the United States Court of Appeals for the Second Circuit was asked to determine the scope of a forum-selection clause that stated: " 'any legal proceedings that may arise out of [the agreement] are to be brought in England.' " *Phillips*, 494 F.3d at 382. In determining the meaning of "arise out of," the court contrasted language such as "in connection with" as being more expansive: "[w]e do not understand the words 'arise out of' as encompassing all claims that have some possible relationship with the contract, including claims that may only 'relate to,' be 'associated with,' or *'arise in connection with'* the contract." *Id.*, 494 F.3d at 389 (emphasis added) (citations omitted). In a different case, the Second Circuit also rejected an interpretation of a forum-selection clause that utilized the phrase "in connection with" as applying only to breach of contract claims:

> There is ample precedent that the scope of clauses similar to those at issue here is not restricted to pure breaches of the contracts containing the clauses. The Managing and Members' Agent's Agreements speak, ... with respect to the forum selection clauses, in terms of submission for "all purposes of and *in connection with*" the agreements (emphasis added). In *Bense v. Interstate Battery System of America*, 683 F.2d 718, 720 (2d Cir.1982), we held that a forum selection clause that applied to "causes of action arising directly or indirectly from [the agreement]" covered federal antitrust actions. Similarly, the Supreme Court in *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, *reh'g denied*, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974), held that controversies and claims "arising out of" a contract for the sale of a business covered securities violations related to that sale. *Id.*, 417 U.S. at 519–20, 94 S.Ct. at 2457. We find no substantive difference in the present context between the phrases "relating to," "in connection with" or "arising from." We therefore reject the [Appellants'] contention that only allegations of contractual violations fall within the scope of the clauses.

*Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir.1993).

Given the similarities between the phrases "in connection with" and "in relation to," we also note that the Third Circuit has reasoned,

> In this case, we must interpret the provision in the forum selection clause that gives the English courts exclusive jurisdiction over "any dispute arising . . . in relation to" the 1990 Agreement. The ordinary meaning of the phrase "arising in relation to" is simple. To say that a dispute "arise[s] . . . in relation to" the 1990 Agreement is to say that the origin of the dispute is related to that agreement, *i.e.*, that the origin of the dispute has some "logical or causal connection" to the 1990 Agreement. *Webster's Third New International Dictionary,* 1916 (1971).

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1074 (3d Cir.1997). *See also Klotz v. Xerox Corp.,* 519 F.Supp.2d 430, 434 & n. 4 (S.D.N.Y.2007) (concluding that "[p]laintiff raises no challenge to the scope of the forum selection clause, nor could she, since the expansive language of the provision—covering '[a]ny action in connection with the Plan by an Employee'—plainly encompasses her claims"; and further commenting that "[p]laintiff's state law tort and contract claims are also part of an 'action in connection with the Plan' and are covered by the clause" (footnote omitted)); *Doe v. Seacamp Assoc., Inc.,* 276 F.Supp.2d 222, 227 (D.Mass.2003) ("A review of the case law leads me to conclude that the tort claims, too, are covered by the forum selection clause. The forum selection clause was worded to indicate that it governed any claim related to or arising from a contract, the subject of which were the terms and conditions of John Doe's enrollment at Seacamp."); *Dexter Axle Co. v. Baan USA, Inc.,* 833 N.E.2d 43, 49 (Ind.Ct.App.2005) (finding tort and statutory claims were subject to forum-selection clause).

Turning to the instant case, we note that the forum-selection clause issue was addressed below in the context of a motion to dismiss; therefore, we consider the claims as they were asserted in the amended complaint.[30] Notably, though, only three of the claims asserted in the amended complaint were ultimately presented to the jury for a verdict, indicating that there was insufficient evidence to support the remaining claims. Accordingly, in deciding whether the claims asserted below were "brought in connection with" the 1997 CSA, we will limit our consideration to only those three claims that ultimately went to the jury. Those three claims, all sounding in tort, were: (1) tortious interference; (2) fraudulent misrepresentation; and (3) fraudulent concealment. Based upon our review of these tort claims, we conclude that they were indeed "brought in connection with" the 1997 CSA.

All of the injuries alleged in connection with the three aforementioned tort claims flow directly from Wellmore's declaration of *force majeure,* an event that is inextricably connected to the 1997 CSA. While the amended complaint methodically sets out numerous details of purported pre-*force majeure* wrongful conduct, no injury resulted from any of that alleged conduct without the declaration of *force majeure* under the 1997 CSA.

For example, "Count I" of the amended complaint alleges tortious interference with existing contractual relations, and specifically identifies existing contracts with Wellmore (the 1997 CSA), Penn Virginia (the lease of the Harman Coal reserves), and the UMWA (a labor contract). Certainly a claim of interference with the 1997 CSA itself is related to that contract. With respect to the Penn Virginia and UMWA contracts, it was Wellmore's declaration of *force majeure* that placed the Harman Companies and Mr. Caperton in the position of being unable to fulfill their contractual obligations. Without the *force majeure,* those contractual relations would have been unaffected by the actions of the Massey Defendants. Thus, this claim is "brought in connection with" the 1997 CSA.

"Count II" of the amended complaint alleged tortious interference with prospective contractual relations, again involving Wellmore, Penn Virginia and the UMWA. As with Count I, the key to these claims remains Wellmore's wrongful declaration of *force majeure.* In the absence of the declaration

---

**30.** *See supra* note 29.

of *force majeure*, the Harman Companies would not have been forced into bankruptcy and their prospective contractual relationships would not have been impeded by Massey. Therefore this claim is "brought in connection with" the 1997 CSA.

Finally, "Count III" alleges fraudulent misrepresentation, deceit and concealment either related to the declaration of *force majeure* itself or related to subsequent negotiations between the Harman Companies and the Massey Defendants "regarding their intentions to enter into a settlement agreement with Harman in connection with the 1997 CSA." Insofar as this claim either relates directly to the declaration of *force majeure* under the 1997 CSA, or to the parties' efforts to reach a settlement with respect to the 1997 CSA, it is "brought in connection with" the 1997 CSA.

Accordingly, because none of the relevant claims asserted in the amended complaint would have existed in the absence of Wellmore's declaration of *force majeure* under the 1997 CSA, these claims are all "brought in connection with" the 1997 CSA and, as a consequence, are within the scope of the forum-selection clause contained therein.[31]

**b. Are the parties involved in the suit subject to the forum-selection clause?** The Harman Companies and Mr. Caperton have argued that, as strangers to the 1997 CSA, the Massey Defendants are precluded from enforcing its terms as they are not third-party beneficiaries of the contract. The Harman Companies and Mr. Caperton further argued that two of the plaintiffs to this action, Harman Development and Mr. Caperton (in his individual capacity), are not signatories to the 1997 CSA and, therefore,

may not be bound by its terms. We disagree.

Other courts addressing the issue of whether non-signatories to a contract may enforce, or be subject to, a forum-selection clause have found the clauses to be enforceable under certain circumstances. One such case is *Manetti–Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509 (9th Cir.1988). The *Manetti–Farrow* case involved a contract between a California corporation, Manetti–Farrow, and Gucci Parfums, an Italian corporation that was a subsidiary of another Italian corporation, Guccio Gucci, S.p.A. (hereinafter referred to as "Guccio Gucci"). The contract included a forum-selection clause that stated: "[f]or any controversy regarding interpretation or fulfillment of the present contract, the Court of Florence has sole jurisdiction." *Manetti–Farrow*, 858 F.2d at 511. Another company, Gucci America, signed a consent and ratification agreement, in which it consented to the contract between Manetti–Farrow and Gucci Parfums. Ultimately a dispute arose, and Manetti–Farrow filed suit in California alleging numerous causes of action, not only against Gucci Parfums and Gucci America, but also against the parent company, Guccio Gucci, as well as numerous officers of these companies. *Manetti–Farrow*, 858 F.2d at 511–12. Upholding the district court's dismissal based upon the forum-selection clause, the Ninth Circuit found that a forum-selection clause was applicable to "a range of transaction participants" who were "closely related to the contractual relationship":

> Manetti–Farrow argues the forum selection clause can only apply to Gucci Parfums, which was the only defendant to sign the contract. However, "a range of transaction participants, parties and non-par-

---

31. Some courts have concluded that a forum-selection clause is applicable to tort claims only where the resolution of the claim requires interpretation of the contract. *See Manetti–Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir.1988) ("Whether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract." (citing *Weidner Communications, Inc. v. Faisal*, 671 F.Supp. 531, 537 (N.D.Ill.1987); *Berrett v. Life Ins. Co.*, 623 F.Supp. 946, 948–49 (D.Utah 1985); *Clinton v. Janger*, 583 F.Supp. 284, 288 (N.D.Ill.1984))).

While we might agree with this proposition were we presented with a more narrowly tailored forum-selection clause applying to claims "arising under" or "arising out of" the contract, we see no need for such a narrow rule in the context of a broadly worded forum-selection clause such as the one presently before us. Nevertheless, we do note that, insofar as the claims asserted in this action all flow from the allegedly wrongful declaration of *force majeure*, they would require interpretation of the contract to determine whether the declaration was indeed wrongful.

ties, should benefit from and be subject to forum selection clauses." *Clinton v. Janger*, 583 F.Supp. 284, 290 (N.D.Ill.1984) (citing *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202–03 (3d Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983)). We agree with the district court that the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants.

858 F.2d at 514 n. 5.

Similarly, in *Hugel v. Corporation of Lloyd's*, 999 F.2d 206 (7th Cir.1993), it was argued that two corporate plaintiffs to a lawsuit, GCM and OMI, were not parties to the contract containing the forum-selection clause (which plaintiff Hugel had signed), and therefore, were not bound by the clause. In rejecting the argument, the court relied on the companies' close relationship to the agreement and the foreseeability that they would be bound by the forum-selection clause:[32]

In order to bind a non-party to a forum selection clause, the party must be "closely related" to the dispute such that it becomes "foreseeable" that it will be bound.... Hugel is President and Chairman of the Board of both GCM and OMI. In addition, Hugel owns 99% of the stock of GCM which, in turn, owns 100% of the stock of OMI. The alleged assurances of confidentiality were made to Hugel alone and Hugel alone decided that his corporations would participate in Lloyd's investigation.

Hugel and Lloyd's contracted to settle all of their disputes in England. Although GCM and OMI were not members of Lloyd's, in the course of a dispute between Hugel and Lloyd's, Hugel alone involved his two controlled corporations and supplied information allegedly belonging to those corporations. The district court found that the corporations owned and controlled by Hugel are so closely related to the dispute that they are equally bound by the forum selection clause and must sue in the same court in which Hugel agreed to sue. We hold these findings are not clearly erroneous.

999 F.2d at 209–10. Furthermore, the *Hugel* court made clear that a non-party to a contract need not be a third-party beneficiary in order for the forum-selection clause to be binding against such non-party:

Plaintiffs argue that the court must make a threshold finding that a non-party to a contract is a third-party beneficiary before binding him to a forum selection clause. While it may be true that third-party beneficiaries of a contract would, by definition, satisfy the "closely related" and "foreseeability" requirements, *see e.g.*, *Coastal Steel*, 709 F.2d at 203 (refusing to absolve a third-party beneficiary from the strictures of a forum selection clause which was foreseeable); *Clinton v. Janger*, 583 F.Supp. 284, 290 (N.D.Ill.1984), *a third-party beneficiary status is not required.*

*Hugel*, 999 F.2d at 209–10 n. 7 (emphasis added).[33]

In another case, *Great Northern Insurance Co. v. Constab Polymer–Chemie GmbH & Co.*, No. 5:01–CV–0882 NAM GJD, 2007 WL 2891981 (N.D.N.Y. Sept. 28, 2007), two German companies entered into a supply agreement whereby Constab Polymer–Chemie (hereinafter referred to as "Constab") would supply products used to produce photo

---

**32.** The contract dispute in the *Hugel* case arose after plaintiff Dieter Hugel became a member of the Corporation of Lloyd's. *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 207 (7th Cir.1993). Hugel signed a membership contract that included the forum-selection clause. *Id.* Thereafter, Lloyd's became suspicious that Hugel and GCM were involved in criminal misconduct and initiated an investigation. *Id.* Hugel cooperated with the investigation and provided confidential information pertaining to GCM and OMI. In the subsequent lawsuit, plaintiffs Hugel, GCM and OMI claimed that "they lost business as the result of Lloyd's breach of confidentiality relating to the investigation." *Id.*

**33.** *But see Pixel Enhancement Labs., Inc. v. McGee*, 1998 WL 518187, at *2 (D.Mass.1998) ("As McGee is not a third party beneficiary of the License Agreement, he has no standing to assert its forum selection clause." *McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir.1994) ("[T]hird party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to non-signatories.").

paper to Feliz Schoeller GmbH & Co. and its subsidiaries, one of which was Schoeller–USA. 2007 WL 2891981, at *1. The contract included a forum-selection clause specifying that jurisdiction of certain disputes would be in Warstein, Germany. *Id.*, 2007 WL 2891981, at *7. Constab provided defective products to Schoeller USA, and Schoeller USA, through its insurer, filed suit in California.[34] In rejecting the argument that, as non-parties to the contract Great Northern and Schoeller–USA could not enforce the forum-selection clause, the court reasoned,

> [n]either Great Northern nor [its insured] Schoeller–USA are signatories to the Agreement. However, the enforcement of the forum selection clause is clearly "foreseeable" given the relationships between the parties and the basis upon which plaintiff has commenced this suit. Therefore, the Court finds that the forum selection clause may be invoked against plaintiff. . . .

2007 WL 2891981, at *8. *See also Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir.2006) (enforcing forum selection clause against a non-signatory to the contract on the basis that the non-signatory benefitted from the performance of the contract); *Marano Enters. of Kansas v. Z–Teca Rests., L.P.*, 254 F.3d 753, 757 (8th Cir.2001) (concluding non-signatory to contract was "closely related to the disputes arising out of the agreements and properly bound by the forum-selection provisions" due to his status of "shareholder, officer and director" of corporate signatory (internal quotations and citation omitted)); *Medtronic, Inc. v. Endologix, Inc.*, 530 F.Supp.2d 1054, 1056–57 (D.Minn.2008) ("[A] third party may be bound by a forum-selection clause where it is closely related to the dispute such that it becomes foreseeable that it will be bound. . . . It is true that the majority of cases binding a third party to a forum-selection clause under the closely-related-party doctrine involved third parties *suing* as plaintiffs, rather than those *being sued* as defendants. . . . But the Court does not believe that the closely-related-party doctrine is limited to third-party plaintiffs. Indeed,

when deciding whether the doctrine applies, a court must answer only the following question: should the third party reasonably foresee being bound by the forum-selection clause because of its relationships to the cause of action and the signatory to the forum-selection clause?" (internal quotations and citations omitted)); *Compana LLC v. Mondial Assistance SAS*, No. 3:07–CV–1293–D, 2008 WL 190522, at *4 (N.D.Tex. Jan. 23, 2008) ("The Fifth Circuit recognizes two theories of estoppel that can bind a nonparty of a contract to the contract's arbitration or forum selection clause. The first is called an 'intertwined claims theory' of equitable estoppel, which grants a non-signatory to a contract the right to enforce a provision of the contract against a signatory. . . . The Fifth Circuit recognizes another form of estoppel-'direct benefits estoppel'-which grants a signatory to a contract the right to enforce a contract provision against a non-signatory." (internal citations omitted)); *Aspitz v. Witness Sys., Inc.*, No. C 07–02068 RS, 2007 WL 2318004, at *3 (N.D.Cal. Aug. 10, 2007) (observing fact that party did not sign agreement is not controlling as to whether forum-selection clause would be enforced); *Affiliated Mortg. Prot., LLC v. Tareen*, Civ. A. No. 06 4908(DRD), 2007 WL 203947, at *4 (D.N.J. Jan. 24, 2007) ("[W]here a third party's conduct is closely related to the contractual relationship, the forum selection clause applies to the third party." (internal quotations and citation omitted)); *Novak v. Tucows, Inc.*, No. 06CV1909 (JFB)(ARL), 2007 WL 922306, at *13 (E.D.N.Y. March 26, 2007) ("[A]t least two courts within this Circuit have held that [i]t is well established that a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. . . . A non-party to an agreement may be bound by a forum selection clause where the party is closely related to the dispute such that it becomes foreseeable that it will be bound." (internal quotations and citations omitted)); *First Specialty Ins. Corp. v. Admiral Ins. Co.*, No. CV 07 408

---

**34.** Great Northern provided indemnity insurance to Schoeller–USA and, in accordance with the insurance policy, compensated Schoeller–USA for its losses resulting from the defective product and became subrogated to Schoeller–USA's rights.

MO, 2007 WL 1876516, at *3 (D.Or. June 22, 2007) ("[A] range of transaction participants, including non-parties, should be bound by forum selection clauses of an underlying agreement if their conduct is 'closely related to the contractual relationship.' ... The fact that either one or both parties was not a signatory to the underlying contract is not dispositive." (internal citations omitted)); *Hasler Aviation, L.L.C. v. Aircenter, Inc.*, No. 1:06–CV–180, 2007 WL 2463283, at *6 (E.D.Tenn. Aug. 27, 2007) ("Other courts have enforced a contractual forum selection clause against non-signatories to the contract, so long as those parties were closely related to the dispute and it was foreseeable they might be bound." (internal quotations and citations omitted)); *Weingard v. Telepathy, Inc.*, No. 05 Civ.2024(MBM), 2005 WL 2990645, at *5 (S.D.N.Y. Nov. 7, 2005) ("Other Circuits have held that a contractually-based forum selection clause also covers tort claims against non-signatories if the tort claims ultimately depend on the existence of a contractual relationship between the signatory parties, ... or if resolution of the claims relates to interpretation of the contract, or if the tort claims involve the same operative facts as a parallel claim for a breach of contract." ... (internal quotations and citations omitted)); *Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc.*, 949 F.Supp. 1427, 1434 (N.D.Cal.1997) ("It is well established that a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. ... [T]he conduct of GTSI and Mr. Fuller are closely related [to] the contractual relationship between Mr. Graham and TPI, and the forum selection clause applies to both GTSI and Mr. Fuller in spite of the fact that they are not signatories to the PSA." (internal quotations and citations omitted)); *Beck v. CIT Group/Credit Fin., Inc.*, Civ. A. No. 94–5513, 1995 WL 394067, at *6 (E.D.Pa. June 29, 1995) ("That Mr. Beck signed the Security Agreement as president of Beck Co. is of little consequence given his intimate relationship to Beck Co., the benefit to him from the funding provided, the circumstances giving rise to his claims that he was personally injured by the manner in which defendant performed under the agreement and his request to be credited personally for amounts allegedly overcharged to Beck Co. ... Assuming that Mrs. Beck has standing on the claims asserted, she is similarly subject to the forum selection provisions. Moreover, given the relationship of the Becks and the circumstances presented, it would be wholly inappropriate to permit Mr. Beck to evade the forum provision in his guaranty and elsewhere by initiating suit jointly with Mrs. Beck." (internal citations and footnote omitted)); *Sparks Tune–Up Ctrs., Inc. v. Strong*, No. 92 C 5902, 1994 WL 188211, at *5 (N.D.Ill. May 12, 1994) ("The binding thread in cases which hold that a non-signatory party should 'benefit from and be subject to' a forum selection clause is an overriding concern to prevent a contracting party from escaping contractual obligations which he bargained for and/or agreed upon."); *Lu v. Dryclean–U.S.A. of California, Inc.*, 11 Cal.App.4th 1490, 1493–94, 14 Cal.Rptr.2d 906, 908 (1992) ("[P]laintiffs argue enforcement of the forum selection clause would be unreasonable because two of the defendants, Dryclean Franchise and Dryclean U.S.A., did not sign the Agreement containing the clause. Again, we are compelled to disagree. A range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses." (internal quotations and citation omitted)); *Citigroup Inc. v. Caputo*, 957 So.2d 98, 102 (Fla.Ct.App.2007) ("Even assuming Citigroup were not covered by the Citibank Agreement, a non-signatory may invoke a signatory's forum selection clause where the non-signatory and signatory are related."); *Deloitte & Touche v. Gencor Indus., Inc.*, 929 So.2d 678, 684 (Fla.Dist.Ct. App.2006) (observing that "where the interests of a non-party are directly related to or completely derivative of those of the contracting party, the non-signatory is bound by the contract's forum selection clause."); *Tuttle's Design–Build, Inc. v. Florida Fancy, Inc.*, 604 So.2d 873, 873–74 (Fla.Dist.Ct.App. 1992) (recognizing that reasonable forum-selection clause would be enforced against non-signatory); *Brinson v. Martin*, 220 Ga.App. 638, 640, 469 S.E.2d 537, 539–40 (Ga.Ct.App. 1996) ("[Plaintiff] Brinson also contends the court erred in dismissing his claims against

Martin. He argues that regardless of whether the venue clause is applicable to Woodmen, the clause would not apply to his claims against Martin for tortious interference with economic relations and unjust enrichment because those claims do not arise out of the contract and involve parties who were not signatories to the contract.... [D]espite Brinson's attempt to characterize his claims against Martin as falling outside the business relationship he had with Woodmen, it is clear from his complaint that the claims arose either directly or indirectly from his contract with Woodmen. Under these circumstances, we are persuaded that if Martin were not entitled to rely on the clause, separate actions would likely be brought, possibly resulting in varying decisions, inconsistent with the administration of justice. For these reasons, we conclude that the trial court did not err in ruling that Martin may rely on the forum selection clause in this case."); *Grott v. Jim Barna Log Sys.-Midwest, Inc.,* 794 N.E.2d 1098, 1104–05 (Ind.Ct.App.2003) ("The Texas Court of Appeals has applied forum-selection clauses to nonsignatories to a contract who are transaction participants[,] ... mean[ing] an employee of one of the contracting parties who is individually named by another contracting party in a suit arising out of the contract containing the forum-selection clause." (internal quotations, citations, and footnotes omitted)); *Titan Indem. Co. v. Hood,* 895 So.2d 138, 148 (Miss.2004) (quoting approvingly comment from *Accelerated Christian Educ., Inc. v. Oracle Corp.,* 925 S.W.2d 66, 75 (Tex.Ct.App.1996), stating "[w]e agree with the federal court that a valid forum selection clause governs all transaction participants, regardless of whether the participants were actual signatories to the contract ..."); *Dogmoch Int'l Corp. v. Dresdner Bank AG,* 304 A.D.2d 396, 397, 757 N.Y.S.2d 557 (N.Y.App.Div.2003) ("Although defendant was a nonsignatory to the account agreements, it was reasonably foreseeable that it would seek to enforce the forum selection clause given the close relationship between itself and its subsidiary...."); *Kelly v. Bear, Stearns & Co. Inc.,* No. CONTROL 080832, 2001 WL 1807360, at *2 (Pa.Com.Pl. Dec. 18, 2001) ("[P]laintiffs argue that as non-signatories to the Engagement Letters,

the forum selection clause does not apply to them. This court disagrees. This dispute is governed by the forum selection clause because the claims asserted clearly arise out of the only possible relationship plaintiffs had with Bear Stearns—the Engagement Letters."); *Sevier County Bank v. Paymentech Merch. Servs., Inc.,* No. E2005–02420–COA–R3–CV, 2006 WL 2423547, at *9 (Tenn.Ct. App. Aug. 23, 2006) ("We agree with the federal court that a valid forum selection clause governs all transaction participants, regardless of whether the participants were actual signatories to the contract. By transaction participant, we mean an employee of one of the contracting parties who is individually named by another contracting party in a suit arising out of the contract containing the forum selection clause. To hold otherwise would allow a nonsignatory employee, who was a transaction participant, to defeat his company's agreed-to forum by refusing to be bound by the employer's contract. This cannot be. We conclude the trial court may apply a valid forum selection clause to all transaction participants. To conclude otherwise would enable a party to bypass a valid forum selection clause by naming in its petition a closely-related party who was not a party to the contract."); *Accelerated Christian Educ., Inc. v. Oracle Corp.,* 925 S.W.2d 66, 75 (Tex.Ct.App.1996) ("We conclude the trial court may apply a valid forum selection clause to all transaction participants. To conclude otherwise would enable a party to bypass a valid forum selection clause by naming in its petition a closely-related party who was not a party to the contract." (footnote omitted)), *overruled in part on other grounds by In re Tyco Electronics Power Systems, Inc.,* No. 05–04–01808–CV, 2005 WL 237232 (Tex.Ct.App. Feb. 2, 2005) (mem.).

██ Based upon the foregoing, we now hold that a range of transaction participants, signatories and non-signatories, may benefit from and be subject to a forum selection clause. In order for a non-signatory to benefit from or be subject to a forum selection clause, the non-signatory must be closely related to the dispute such that it becomes foreseeable that the non-signatory may benefit from or be subject to the forum selection clause.

■ Applying the foregoing holding to the facts of the instant case, we first note that, as to the plaintiffs, Sovereign; Mr. Caperton, as president of Sovereign; and Harman Mining were signatories to the 1997 CSA; Harman Development and Mr. Caperton, in his individual capacity, were not. However, Sovereign and Harman are wholly-owned subsidiaries of Harman Development, and Mr. Caperton is the sole owner of Harman Development. Under these facts, Mr. Caperton and Harman Development were closely connected to the 1997 CSA such that it was foreseeable that they would be subject to the forum-selection clause contained therein. As we determined in the preceding section of this opinion, the three factually-supported claims asserted in the first amended complaint [35] all flowed from the wrongful declaration of *force majeure* under the 1997 CSA, and were brought in connection with that contract. Accordingly, we find that Mr. Caperton and Harman Development are bound by the forum-selection clause of the 1997 CSA.

■ Turning to the Massey Defendants, we note that none of them were signatories to the 1997 CSA. However, Defendant Massey subsequently became the parent company to Wellmore, who is a signatory of the 1997 CSA, and Wellmore was Massey's subsidiary at the time it declared *force majeure*.[36] All the other Massey Defendants are also subsidiaries of Massey. The complaint plainly alleges that Massey, along with all its subsidiaries who are defendants in this action, exercised "domination and control" over Wellmore and directed Wellmore to wrongfully declare *force majeure*. Under these facts, it is clear that the Massey Defendants are closely connected to the 1997 CSA such that it was foreseeable that they should benefit from the enforcement of the forum-selection clause contained therein.

**4. Rebuttal.** Because the forum-selection clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in this dispute, it is presumptively enforceable. Thus, the final step to our analysis is to ascertain whether the Harman Companies and Mr. Caperton have rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.

■ In this regard, it has been recognized that

[m]andatory choice of forum clauses will be enforced unless they are "unreasonable." *Davis Media Group*, 302 F.Supp.2d at 466 (citing *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. at 10, 92 S.Ct. 1907). "Choice of forum and law provisions may be found unreasonable if (1) their formation was induced by fraud or overreaching; (2) the complaining party 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state." *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir.1996).

*Belfiore v. Summit Fed. Credit Union*, 452 F.Supp.2d 629, 631–32 (D.Md.2006) (footnotes omitted). Moreover,

[a] party trying to defeat a mandatory choice of forum clause bears a "heavy burden." *See Davis Media Group v. Best Western Int'l, Inc.*, 302 F.Supp.2d, 464, 469–70 (D.Md.2004); *see also, e.g., Sarmiento v. BMG Entm't*, 326 F.Supp.2d 1108, 1111 (C.D.Cal.2003) ("[I]f the resist-

**35.** As we noted in the preceding section of this opinion, the forum-selection clause issue was addressed below in the context of a motion to dismiss; therefore, we consider the claims as they were asserted in the first amended complaint. Notably, though, only three of the claims asserted in the amended complaint were ultimately presented to the jury for a verdict, indicating that there was insufficient evidence to support the remaining claims. Therefore, we limit our consideration to only those three claims that ultimately went to the jury.

**36.** The 1997 CSA was executed in March 1997, and was made retroactively effective to January 1, 1997. Massey acquired Wellmore on July 31, 1997, when it purchased United Coal Corporation and United's subsidiary Wellmore. Wellmore declared *force majeure* on December 1, 1997.

ing party fails to come forward with anything beyond general and conclusory allegations of fraud and inconvenience, the court must uphold the agreement").

*Id.* at 631 n. 1. In this case, the Harman Companies and Mr. Caperton have not argued, either below or before this Court, that enforcement of the forum-selection clause of the 1997 CSA, i.e. requiring that this case be litigated in Virginia, was unreasonable or unjust at the time of the Massey Defendants' motion to dismiss,[37] or that the clause was invalid for such reasons as fraud or overreaching. Instead, on the initial rehearing of this case, and again on remand from the United States Supreme Court, the Harman Companies and Mr. Caperton have argued, in part, that it is unjust to apply the forum-selection clause to deprive them of the large jury verdict awarded below. However, this improperly frames the issue. The proper question is whether enforcement of the forum-selection clause was unjust or unreasonable *at the time of the Massey Defendants'* motion to dismiss based upon the forum-selection clause. The Harman Companies and Mr. Caperton have not come forth with any facts or argument that enforcement of the forum-selection clause was unreasonable or unjust at that time. Accordingly, the forum-selection clause should have been enforced by the circuit court, and that court's failure to grant the Massey Defendants' motion to dismiss based upon the forum-selection clause was an abuse of discretion.[38]

**5. Retroactivity of the New Forum–Selection Clause.** On remand from the United States Supreme Court, the Harman Companies and Mr. Caperton argue, as they did on the initial rehearing of this case, that the new forum-selection clause principles of law herein developed should not be applied retroactively to them.[39] They contend, among other things, that due process principles prohibit such application. We disagree.

To begin, we should make clear that, notwithstanding the due process argument made by the Harman Companies and

**37.** Mr. Caperton asserts that because this action has been fully litigated in West Virginia, and because a remedy may no longer be available in Virginia due to the running of the limitations period, it is unjust to enforce the forum selection clause. We reject this reasoning as it would effectively divest appellate courts of their appellate jurisdiction over a lower court's denial of a motion to dismiss based upon a forum selection clause as it relates to tort claims. First, because of the lengthy time involved in prosecuting a case to a final judgment and in pursuing the appellate process, the limitations period for filing a tort action in the proper forum is likely to have always run by the time of this Court's review, thus, there may never be a tort remedy available in the proper forum. Next, the defendants in this action are entitled to seek review of the lower court's decision on appeal. *See* Syllabus point 5, *State ex rel. Davis v. Iman Mining Co.,* 144 W.Va. 46, 106 S.E.2d 97 (1958) (" 'Where an appeal is properly obtained from an appealable decree either final or interlocutory, such appeal will bring with it for review all preceding non-appealable decrees or orders, from which have arisen any of the errors complained of in the decree appealed from, no matter how long they may have been rendered before the appeal was taken.' Point 2, syllabus, *Lloyd v. Kyle,* 26 W.Va. 534 [1885 WL 2564 (1885)]."). Finally, the cases cited by Mr. Caperton in support of his argument that it would be unjust to apply the forum-selection clause where the case is now likely time-barred in the contractual forum are unpersuasive. For example, Mr. Caperton cites *Ernest and Norman Hart Brothers, Inc. v. Town Contractors, Inc.* 18 Mass.App.Ct. 60, 65, 463 N.E.2d 355, 359 (1984). Notably, however, that court's decision was not based solely on the lack of a remedy in the contractual forum state. Rather, the court concluded that the contract at issue was a contract of adhesion. More importantly, the court discussed at length the fact that forum-selection clauses had long been viewed as invalid in Massachusetts, and, at that time, there was no clear indication that Massachusetts would follow the modern view of reasonable and just forum-selection clauses being valid and enforceable. As noted above, in 1981 this Court indicated its approval of reasonable and just forum-selection clauses. *General Elec. Co. v. Keyser,* 166 W.Va. 456, 461–62 n. 2, 275 S.E.2d 289, 292–93 n. 2 (1981).

**38.** We would be remiss if we did not acknowledge that the motivating factor for the Harman Companies and Mr. Caperton to bring the tort claims in West Virginia may have been due to the fact that Virginia has a cap on punitive damages and West Virginia does not. *See* Va.Code § 8.01–38.1 (1987) ("In no event shall the total amount awarded for punitive damages exceed $350,000.00."). Virginia also does not allow punitive damages for contract claims. *See Kamlar Corp. v. Haley,* 224 Va. 699, 705, 299 S.E.2d 514, 517 (Va.1983).

**39.** The Harman Companies briefed this issue in terms of applying the new principles prospectively.

Mr. Caperton, "[i]t is within the inherent power of a state's highest court to give a decision prospective or retrospective application without offending [federal] constitutional principles." *Lopez v. Maez*, 98 N.M. 625, 632, 651 P.2d 1269, 1276 (1982). Stated another way,

> [t]he United States Constitution neither prohibits nor requires retroactive application of a judicial decision, and the question of retrospective or prospective application of a state judicial decision to civil litigation in the state courts is a matter of state law when, as here, the rule in question involves a matter of a common-law tort and is not based on federal constitutional or statutory law.

*Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 112 (Colo.1992). *See also Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 94, 113 S.Ct. 2510, 2516, 125 L.Ed.2d 74 (1993) ("Nothing in the Constitution alters the fundamental rule of 'retrospective operation' that has governed 'judicial decisions for near a thousand years.'" (citation omitted)); *Great N. Ry. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932) ("We think the federal constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward."). In addition to there being no federal constitutional impediment to a judicial decision being applied retroactively, there is likewise no state constitutional impediment. *See Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 347, 256 S.E.2d 879, 887 (1979) ("We do not find any provision in the West Virginia Constitution which addresses this point.").

The Supreme Court of Appeals of West Virginia, like all courts in the country, adheres to the common law principle that, "[a]s a general rule, judicial decisions are retroactive in the sense that they apply both to the parties in the case before the court and to all other parties in pending cases." *Crowe v. Bolduc*, 365 F.3d 86, 93 (1st Cir. 2004). *See also Alaskan Vill., Inc. v. Smalley*, 720 P.2d 945, 949 (Alaska 1986) ("Absent special circumstances, a new rule of law will apply in the case before the court and in all subsequent cases."); *Citicorp N. Am., Inc. v. Franchise Tax Bd.*, 83 Cal.App.4th 1403, 1422, 100 Cal.Rptr.2d 509, 525 (2000) ("[T]he general rule as to judicial opinions is that they are fully retroactive."); *Findley v. Findley*, 280 Ga. 454, 460, 629 S.E.2d 222, 228 (2006) ("[W]e shall continue to apply the general rule that a judicial decision announcing a new rule is retroactive[.]"); *Aleckson v. Village of Round Lake Park*, 176 Ill.2d 82, 86, 223 Ill.Dec. 451, 679 N.E.2d 1224, 1226 (1997) ("Generally, when a court issues an opinion, the decision is presumed to apply ... retroactively[.]"); *Dempsey v. Allstate Ins. Co.*, 325 Mont. 207, 217 104 P.3d 483, 489 (2004) ("Therefore today we reaffirm our general rule that [w]e give retroactive effect to judicial decisions." (internal quotations and citation omitted)); *Ireland v. Worcester Ins. Co.*, 149 N.H. 656, 658, 826 A.2d 577, 580–81 (2003) ("At common law, appellate decisions in civil cases are presumed to apply retroactively."); *Montells v. Haynes*, 133 N.J. 282, 295, 627 A.2d 654, 660 (1993) ("The final issue is whether our decision should follow the general rule of retroactive application[.]"); *Beavers v. Johnson Controls World Servs., Inc.*, 118 N.M. 391, 398, 881 P.2d 1376, 1383 (1994) ("[W]e believe there should be a presumption that a new rule adopted by a judicial decision in a civil case will operate retroactively."); *Christy v. Cranberry Volunteer Ambulance Corps, Inc.*, 579 Pa. 404, 418, 856 A.2d 43, 51 (2004) ("Our general principle is that we apply decisions involving changes of law in civil cases retroactively[.]"); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 515 (Tex.1992) ("Generally, judicial decisions apply retroactively."); *State v. Styles*, 166 Vt. 615, 616, 693 A.2d 734, 735 (1997) ("We have previously adopted the common law rule that a change in law will be given effect while a case is on direct review, except in extraordinary cases. This rule applies whether the proceedings are civil or criminal."); *In re Commitment of Thiel*, 241 Wis.2d 439, 449, 625 N.W.2d 321, 326 (Ct.App.2001) ("Wisconsin generally adheres to the 'Blackstonian Doctrine,' which provides that a decision that clarifies, overrules, creates or changes a rule of law is to be applied retroactively.").

Although the common law rule presumes that appellate judicial decisions apply retroactively, "[t]he courts of this country long have recognized exceptions to the rule of retroactivity[.]" *Ashland Oil, Inc. v. Rose,* 177 W.Va. 20, 23, 350 S.E.2d 531, 534 (1986). The seminal case by this Court addressing the issue of an exception to retroactivity is *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979).

In *Bradley,* this Court was asked to decide whether or not our contributory negligence rule should be modified to allow for comparative negligence. After an exhaustive examination of the history of the contributory negligence doctrine, *Bradley* found that modification of the doctrine was warranted. In so doing the opinion held,

[o]ur present judicial rule of contributory negligence is therefore modified to provide that a party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident. To the extent that our prior contributory negligence cases are inconsistent with this rule, they are overruled.

*Bradley,* 163 W.Va. at 342, 256 S.E.2d at 885.

Insofar as *Bradley* overruled prior contributory negligence case law, the opinion addressed the issue of whether or not the new comparative negligence rule would be applied retroactively to cases pending at the time of the decision. To resolve the issue of retroactivity, in the context of new law that overruled prior case law, *Bradley* looked for guidance from the United States Supreme Court's decision in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), *overruled by Harper v. Virginia Department of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993).[40] After examining relevant language from the opinion in *Chevron, Bradley* fashioned the following test:

In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions.

Syl. pt. 5, *Bradley.*

The retroactivity test announced in *Bradley* has been relied upon by this Court whenever the issue of retroactivity has arisen in a civil case. However, the *Bradley* test is narrowly confined to deciding whether to retroactively apply a new principle of law that was created in a case that overruled prior precedent. The narrow constraints of *Bradley* have proved to be problematic whenever this Court has examined retroactivity in the context of a new principle of law created in a case that did not overrule prior precedent. *See, e.g., Richmond v. Levin,* 219 W.Va. 512, 517, 637 S.E.2d 610, 615 (2006) ("[T]he analy-

---

**40.** The *Bradley* decision acknowledged a prior principle of law created by the Court that involved retroactivity, but found that prior principle was too narrow. *See* Syl. pt. 2, *Falconer v. Simmons,* 51 W.Va. 172, 41 S.E. 193 (1902) ("An overruled decision is regarded not law, as never having been the law, but the law as given in the later case is regarded as having been the law, even at the date of the erroneous decision. To this rule there is one exception,—that where there is a statute, and a decision giving it a certain construction, and there is a contract valid under such construction, the later decision does not retroact so as to invalidate such contract.").

sis established by *Bradley* is not directly on point since the question in the case before us does not involve overruling any prior authority[.]" (internal quotations and citation omitted)); *Adkins v. Cline*, 216 W.Va. 504, 510, 607 S.E.2d 833, 839 (2004) ("The *Bradley* formula does not give specific guidance to our current situation[.]"); *Kincaid v. Mangum*, 189 W.Va. 404, 414, 432 S.E.2d 74, 84 (1993) ("[T]he plaintiffs correctly point out that the analysis established by *Bradley* is not directly on point since the question in the case before us does not involve overruling any prior authority[.]"). Because of the limitations imposed by *Bradley* on the issue of retroactivity, we believe that another test, designed to compliment *Bradley*, must be utilized whenever this Court is called upon to examine the issue of retroactively applying a new rule of law from a case that did not overrule any prior decision of this Court. In formulating such a test, we need look no further than the *Bradley* opinion itself.

 The retroactivity test created in *Bradley* was fashioned from the following language that appeared in *Chevron* and was quoted in *Bradley*:

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, ... by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.

Finally, we have weighed the inequity imposed by retroactive application, for where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice or hardship by a holding of nonretroactivity.

*Bradley*, 163 W.Va. at 347, 256 S.E.2d at 888 (quoting *Chevron*, 404 U.S. at 106–07, 92 S.Ct. at 355 (internal quotations and additional citations omitted)).[41] With the *Chevron* factors as a guide, we now hold that in determining whether to extend full retroactivity to a new principle of law established in a civil case that *does not overrule* any prior precedent, which is an issue that was not addressed in Syllabus point 5 of *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), the following factors will be considered. First, we will determine whether the new principle of law was an issue of first impression whose resolution was clearly foreshadowed. Second, we must determine whether or not the purpose and effect of the new rule will be enhanced or retarded by applying the rule retroactively. Finally, we will determine whether full retroactivity of the new rule would produce substantial inequitable results.

In the instant proceeding, we are called upon to decide whether or not the principles of law developed in this opinion, involving forum-selection clauses, should be applied retroactively to the parties. Under the test set out above, we find no impediment to applying the new forum-selection clause principles to the parties in this case.

 **a. The new forum-selection clause principles were clearly foreshad-**

41. The *Chevron* test was overruled in *Harper v. Virginia Department of Taxation*, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). In *Harper*, the Supreme Court held that new federal judicial rules would no longer be open for selective retroactivity. The Supreme Court addressed the issue succinctly as follows:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule. The rule extends *Griffith*'s ban against selective ap-

plication of new rules. Mindful of the basic norms of constitutional adjudication that animated our view of retroactivity in the criminal context, we now prohibit the erection of selective temporal barriers to the application of federal law in noncriminal cases.

*Harper*, 509 U.S. at 97, 113 S.Ct. at 2517 (internal quotations and citations omitted). It has been correctly noted that "although the United States Supreme Court has rejected *Chevron*, the states are free to continue employing the *Chevron* criteria in deciding questions of retroactivity of state law." *Dempsey v. Allstate Ins. Co.*, 325 Mont. 207, 104 P.3d 483, 488 (2004).

**owed.** The Harman Companies and Mr. Caperton argue that the new forum-selection clause principles applied in this case were not foreshadowed by any prior decision of this Court. We disagree.

■ To begin, the Harman Companies and Mr. Caperton misunderstand the meaning of "foreshadowed," as that term is applied in the present context. Foreshadowing does not mean that "there has to be clear precedent before a holding can be considered clearly foreshadowed." *Collins v. Department of Corr.*, 167 Mich.App. 263, 267, 421 N.W.2d 657, 659 (1988). All that is required is some indication by a prior decision of this Court or a national trend that would "put persons on notice that [this Court] could resolve the issue either way[.]" *Id. See also Founder v. Cabinet for Human Res.*, 23 S.W.3d 221, 224 (Ky.Ct.App.1999) (holding that prior judicial decision put plaintiff "on notice that it was possible that the filing of the complaint with the Commission would bar a separate action in circuit court. Thus, it was not error for the court to retroactively apply [a new decision]."). A case which helps illustrate the broad meaning of "foreshadowing" is *Professional Insurance Corp. v. Sutherland*, 700 So.2d 347 (Ala.1997).

In *Sutherland*, the plaintiffs sued several defendant insurance companies in an Alabama trial court for tort and breach of contract claims. The defendants filed a motion to dismiss on the grounds that, under the terms of contractual forum-selection clauses between the parties, all causes of action had to be filed in Florida. The trial court denied the motion to dismiss on the grounds that prior Alabama case law held that "outbound" forum-selection clauses were against public policy. The defendants appealed to the Alabama Supreme Court. That Court apparently issued an opinion that was withdrawn after a rehearing was granted. In the rehearing opinion, the Court held that it was overruling prior case law that barred "outbound" forum-selection clauses. More important to the case at hand, the Court addressed the issue of whether or not the new rule would be applied retroactively to the parties before the Court. In finding that the decision would be applied to the parties, *Sutherland* addressed the issue of foreshadowing as follows:

> The plaintiffs contend that when they were negotiating their contracts they relied upon the rule making forum selection provisions invalid in Alabama and that the rule we adopt today represents a fundamental change in the substantive law of this state. Therefore, they claim, an application of the "new" rule against them would be an unfair retroactive application. We disagree.
>
> . . . .
>
> We conclude that it is fair to apply the rule enforcing forum selection clauses to the parties in this case. As noted previously, while American courts traditionally disfavored outbound forum selection clauses, the overwhelming trend, following the United States Supreme Court's decision in *M/S Bremen, supra,* has been toward allowing enforcement of those clauses. *That nationwide trend foreshadowed our adoption today of the rule that such clauses are not per se void, providing notice that Alabama might follow suit and thereby reducing the reliance these plaintiffs could reasonably have placed upon the continued viability of the traditional rule in Alabama.*

*Sutherland,* 700 So.2d at 351–52 (emphasis added).

Although the Alabama Supreme Court relied upon a nationwide trend as foreshadowing its new rule in *Sutherland,* we need not look to a national trend to find that the new forum-selection clause principles developed in this case were foreshadowed. As previously pointed out in this opinion, over twenty-five years ago in *General Electric Co. v. Keyser,* 166 W.Va. 456, 275 S.E.2d 289 (1981), this Court indicated that forum-selection clauses were not against the public policy of this State. Specifically, we stated in *Keyser,*

> We have had occasion, however, to discuss, indirectly, forum selection clauses. Although our law on this point is skeletal, it does indicate that contract clauses which affect matters such as jurisdiction and the like should be carefully analyzed. Unquestionably, forum selection clauses are not contrary to public policy in and of them-

selves for they are sanctioned in commercial sales agreements[.]

*Keyser,* 166 W.Va. at 461 n. 2, 275 S.E.2d at 291 n. 2. Clearly, *Keyser* placed the parties in this action on notice that, when presented with an opportunity, this Court would "carefully" analyze all matters relevant to the forum-selection clause presented on appeal. Contrary to the arguments of the Harman Companies and Mr. Caperton, there is no requirement that there must exist specific precedent that foreshadowed exactly how this Court would resolve new issues involving a forum-selection clause. If such a situation was the law in this State or any jurisdiction in the country, there would be very few cases decided on appeal that created new law which could be applied to the parties before the appellate court. This is not the law in the country nor in West Virginia. Consequently, we find that the new forum-selection clause principles created in this opinion were foreshadowed by *Keyser.*

■ **b. The purpose and effect of the new rules will be enhanced by applying the rules retroactively to the parties.** In other parts of this opinion we have discussed the general purpose and effect of forum-selection clauses. The new forum-selection clause principles announced in this decision simply provide parameters for the enforcement of forum-selection clauses. To deny application of those principles to the parties in this litigation would undermine the very essence of forum-selection clauses, which is to require parties and those in privity thereto to litigate claims in a forum voluntarily chosen by them.

■ **c. No substantial inequitable results would flow from applying the new forum-selection clause principles retroactively.** We have not been presented with any valid reason to show that applying the new principles would bring about a substantial inequitable result. "Indeed, limiting this decision to prospective application would produce inequitable results[.]" *Cundiff v. State Farm Mut. Auto. Ins. Co.,* 217 Ariz. 358, 362, 174 P.3d 270, 274 (2008). This is true because there is no evidence in the record to show that the forum-selection clause involved in this case was not freely bargained for by the actual signatories to the agreement. To allow one signatory to the agreement to escape its effects through prospective application of our new principles would simply be inequitable.

Accordingly, we conclude that the forum-selection clause principles of law adopted by this opinion may properly be applied to the parties to the instant proceeding.

**6. The bankruptcy court's order did not have any preclusive effect on the forum selection clause issue.** The final matter we must address in this area concerns Mr. Caperton's argument "that the United States Bankruptcy Court for the Western District of Virginia has rendered a final, uncontested ruling specifically finding West Virginia to be the proper forum for this Action." [42] As a result of this alleged final decision, Mr. Caperton contends that the doctrine of collateral estoppel precludes relitigation of the issue in the state court proceedings.[43]

■ To begin, we note that "[t]here is no question that the doctrines of res judicata and collateral estoppel apply to decisions rendered in Federal Bankruptcy Courts." *Jerome J. Steiker Co., Inc. v. Eccelston Props. Ltd.,* 156 Misc.2d 308, 593 N.Y.S.2d 394, 398 (1992). Further, because Mr. Caperton contends that the bankruptcy proceeding adjudicated the forum selection clause issue, "the federal rules of preclusion must be applied." *Sea Quest Int'l., Inc. v. Trident Shipworks, Inc.,* 958 So.2d 1115, 1119 (Fla.Dist.Ct.App. 2007). Under federal law, a party asserting

**42.** We have previously noted that the Massey Defendants attempted to intervene in the bankruptcy proceeding filed by the Harman Companies. The purpose of this attempted intervention was "to determine whether the Caperton's (sic) and Harman Development's claims were actually assets of the bankruptcy estates and whether Hugh Caperton was attempting to deprive the bankruptcy estates of those assets improperly."

*Caperton v. A.T. Massey Coal Co., Inc.,* 270 B.R. 654, 655 (S.D.W.Va.2001).

**43.** Mr. Caperton also contends that the doctrine of res judicata applies. Insofar as Mr. Caperton is only attacking the disposition of the forum selection clause issue, we need not separately address the res judicata claim. The result would be the same under an analysis of either doctrine.

collateral estoppel as a bar to relitigating an issue must establish

(1) the issue to be precluded is identical to the issue already litigated, (2) the issue was actually determined in the prior proceeding, (3) the determination of the issue was an essential part of the decision in the prior proceeding, (4) the prior judgment was final and valid, and (5) the party against whom estoppel is asserted had a full and fair opportunity to litigate the issue.

*In re Coleman*, 426 F.3d 719, 729 (4th Cir. 2005).[44]

We need not labor long on this issue. The second element of collateral estoppel is dispositive of the matter. In order for collateral estoppel to apply to the forum selection clause issue, the matter had to actually be determined in the bankruptcy proceeding. As we shall demonstrate below, it was not.

■ As previously indicated in this opinion, the Massey Defendants attempted to have the instant case removed to a federal district court in the Southern District of West Virginia. In response to the removal, the Harman Companies and Mr. Caperton asked the federal district court to remand the case to state court. The federal district court issued a written opinion indicating that it would hold in abeyance any ruling about the propriety of the case being in federal court until the bankruptcy court made a ruling on the claims asserted by Massey as an intervenor. *See Caperton v. A.T. Massey Coal Co., Inc.*, 251 B.R. 322 (S.D.W.Va. 2000).[45] Subsequent to the bankruptcy court issuing an order that involved Massey's intervention claims, the federal district court issued another written order that interpreted the bankruptcy court's order regarding Massey's claims. The federal district court made the following findings:

As set forth in its November 28, 2000 Joint Memorandum Opinion, the Bankruptcy Court attempted to respond to this Court's Memorandum Opinion and Order and determined the crucial question was whether Caperton and/or Harman Development have any independent causes of action under West Virginia law. The Bankruptcy Court then clarified what possible claims Caperton and Harman Development might have that are independent and non-derivative of the bankrupt estates' claims. It declined, however, to decide whether such claims have actual, legal validity under West Virginia state law. Instead, the Bankruptcy Court opined this question was better addressed by a West Virginia court, either state or federal, and abstained from deciding the questions presented by the declaratory judgment/adversary proceedings. *Integral to its decision to abstain and dismiss the adversary proceedings, the Bankruptcy Court determined the claims of all parties, and defenses thereto, can be adjudicated satisfactorily in the West Virginia action.*

*Caperton v. A.T. Massey Coal Co., Inc.*, 270 B.R. 654, 655–56 (S.D.W.Va.2001) (emphasis added). As a result of the federal district court's determination that the bankruptcy court abstained from deciding *any* issue involving the Massey intervention claims, the federal district court declined a motion by the Massey Defendants to transfer the case to a federal district court in Virginia. Specifically, the federal district court held that the Massey Defendants' "motion for transfer of venue to the District Court of the Western District of Virginia is DENIED as moot, leaving the Circuit Court of Boone County to decide whether transfer of venue remains for determination." *Caperton*, 270 B.R. at 656.[46]

---

**44.** The elements required to prove collateral estoppel under West Virginia law are almost identical to the federal elements. *See* Syl. pt. 1, *Haba v. Big Arm Bar & Grill, Inc.*, 196 W.Va. 129, 468 S.E.2d 915 (1996).

**45.** It appears that the federal district court entertained the Massey Defendants' removal petition under its bankruptcy jurisdiction, because of the bankruptcy proceeding that was pending in Virginia.

**46.** In a footnote in Mr. Caperton's supplemental brief he attempts to suggest that the federal district court "found it appropriate for the case to ultimately proceed in West Virginia." The footnote is disingenuous in trying to suggest that the federal district court found that West Virginia had to allow the case to be fully litigated on the merits. The federal district court's order, like the bankruptcy court's order, left it up to the West Virginia courts to decide the merits of all

It is generally acknowledged that "the lower federal courts do not have appellate jurisdiction over the state courts and their decisions are not conclusive on state courts, even on questions of federal law." *State v. Robinson*, 319 Mont. 82, 82 P.3d 27, 30 (2003). *See also Cash Distrib. Co., Inc. v. Neely*, 947 So.2d 286, 292 n. 5 (Miss.2007) ("[S]tate supreme courts are not duty-bound to follow a federal court of appeals' interpretation of federal law."). Thus, the federal district court's interpretation of the bankruptcy court's order is not binding on this Court. Even so, we agree with the federal district court that the bankruptcy court's order did not address the merits of any issue or claim raised by Massey's attempted intervention in the bankruptcy proceeding.[47] The bankruptcy court's Joint Memorandum Opinion made the following findings:

> By this adversary proceeding, Massey seeks a determination of the respective ownership interests of Caperton and the bankruptcy estates of the Debtors in causes of action currently being pursued jointly by Caperton and the Debtors in the West Virginia Action. . . .
>
> . . . .

claims and defenses asserted in the state court proceeding.

We should point out that the federal district court abstained from hearing any claim or defense asserted in the state court proceeding under the *mandatory* abstention provision of bankruptcy law, because the state law litigation was not a core proceeding for bankruptcy purposes. Specifically, the federal district court held,

> The Court holds [the Harman Companies' and Mr. Caperton's] claims are non-core because: 1) the claims are not specifically identified as core proceedings under 28 U.S.C. § 157(b)(2); 2) the claims existed prior to the filing of the [Harman Companies'] bankruptcy petitions; 3) the claims are based solely on state law and therefore exist independent of the provisions of Chapter 11; and 4) the parties' rights are not affected by the outcome of the bankruptcy proceedings.

*Caperton*, 270 B.R. at 657. It is generally recognized that res judicata and collateral estoppel "bar[] only claims that would constitute a core claim in an earlier bankruptcy action." *Cabrera v. First Nat'l Bank of Wheaton*, 324 Ill.App.3d 85, 257 Ill.Dec. 512, 753 N.E.2d 1138, 1147 (2001). *See also I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1548 (11th Cir.1986) (In "a non-

. . . Massey alleges that Caperton and Harman Development are seeking to enforce for their own benefit alleged claims which are assets solely of the bankruptcy estates of Harman Mining and Sovereign. However, in these proceedings, Massey's real object appears to be to obtain a judicial determination that under West Virginia law Caperton and Harman Development have no independent claims of their own which they can pursue against Massey for its alleged wrongful conduct. Because such a determination can be better rendered in the West Virginia Action, this Court chooses to abstain from hearing these declaratory judgment actions in favor of resolution by an appropriate West Virginia forum, whether state or federal.

. . .

. . . Most important to this Court's decision to abstain in these adversary proceedings is that the viability of Caperton's and Harman Development's claims is determined by West Virginia state law and not federal bankruptcy law. Accordingly, all of these issues can be addressed satisfactorily and most appropriately in the West Virginia Action.

core proceeding, the bankruptcy court could only issue proposed findings of fact and conclusions of law, which would be subject to de novo review by the district court, and such proposed findings would not be entitled to res judicata effect in subsequent litigation because there would have been no final judgment on the merits." (internal citations omitted)); *SMI/USA, Inc. v. Profile Tech., Inc.*, 38 S.W.3d 205, 211 (Tex.Ct.App. 2001) ("Although a bankruptcy judge may hear non-core proceedings and make proposed Findings of Fact and Conclusions of Law to the District Court, the judge may not render a final judgment on such claims. As a result, a bankruptcy court's disposition of non-core proceedings is not res judicata as to subsequent state court proceedings regarding the same claims.").

47. Mr. Caperton's res judicata claim would fail because the bankruptcy court did not enter a final judgment on the merits of Massey's intervention claims. *See Israel Disc. Bank Ltd. v. Entin*, 951 F.2d 311, 314 (11th Cir.1992) ("Res judicata . . . will bar a subsequent action if: (1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits; and (4) the prior and present causes of action are the same.").

Additionally, the bankruptcy court's Joint Order filed with the Joint Memorandum Opinion made the following conclusions of law:

For the reasons expressed in this Court's Joint Memorandum Opinion entered contemporaneously herewith, in the event that Hugh Caperton and/or Harman Development Corporation are determined to have alleged independent, non-derivative claims pursuant to West Virginia law, those causes of action are hereby DECLARED not to be property of the bankruptcy estate of either Harman Mining Corporation or Sovereign Coal Sales, Incorporated. However, also for the reasons stated in such Joint Memorandum Opinion, this Court ABSTAINS from deciding whether any such claims are properly alleged or have legal validity. Accordingly, it is ORDERED that these adversary proceedings are DISMISSED.

Clearly it is evident that the bankruptcy court's Joint Memorandum Opinion and Joint Order did not address the merits of any claim, issue or defense involved in the state court proceeding. Further, "[b]ecause the [forum selection clause] issue ... was neither decided on the merits nor necessary to support the bankruptcy court's judgment, we agree with [the Massey Defendants] that the doctrines of collateral estoppel and res judicata do not bar [raising the defense] in this case." *Cousatte v. Lucas*, 35 Kan.App.2d 858, 136 P.3d 484, 491 (2006). *See also Kennedy v. First Nat'l Bank of Decatur*, 129 Ill.App.3d 633, 85 Ill.Dec. 236, 473 N.E.2d 604, 608 (1985) ("[T]he doctrine of collateral estoppel does not bar the issue of whether [plaintiff] was injured individually because (1) such issue was not actually or necessarily decided in the bankruptcy proceeding, and (2) the Bankruptcy Court expressly determined that it had no jurisdiction over such issue."); *Eicher v. Mid Am. Fin. Inv. Corp.*, 270 Neb. 370, 702 N.W.2d 792, 810 (2005) ("Because [plaintiff's] claim in this case was not barred by the judgment in the prior bankruptcy action under the doctrines of either res judicata or collateral estoppel, the district court erred in granting the motion for partial summary judgment dismissing his claim.").[48]

## V.

## CONCLUSION

For the reasons stated in the body of this opinion, we reverse the judgment in this case and remand for the circuit court to enter an order dismissing this case against A.T. Massey Coal Company and its subsidiaries with prejudice.

Reversed and remanded.

Chief Justice BENJAMIN, having been disqualified, did not participate in the decision of this case.

Senior Status Judge HOLLIDAY sitting by temporary assignment.

Justice WORKMAN dissents and reserves the right to file a dissenting opinion.

WORKMAN, Justice, dissenting.

(Filed Nov. 30, 2009)

Neither the sheer length of the majority's opinion, nor the large number of cases cited (but erroneously applied), nor even its expansive conclusory statements, can obfuscate its lack of sound legal reasoning and its result-driven approach.

In enunciating *eight* major new points of law and applying them retroactively (with no opportunity for the parties to make a record under the new law), scrapping mountains of prior precedent that give deference to the finders of fact below (and instead making new factual determinations at this level), rewarding the defendant (whose conduct is seemingly recognized by all as reprehensible) the spoils of its fraudulent acts, and then characterizing the result as "equitable," the

---

**48.** Prior opinions issued in this case (one of which was withdrawn by this Court upon granting a rehearing, and one of which was reversed by the United States Supreme Court in *Caperton v. A.T. Massey Coal Co., Inc.*, — U.S. ——, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009)), addressed the additional issue of *res judicata*. However, the Justices and Senior Status Judge who make up the Majority in deciding this matter anew have determined that it is not necessary to address the *res judicata* issue.

majority has turned West Virginia jurisprudence on its ear.

Specifically, the majority holds that Massey, despite engaging in wide-ranging fraudulent conduct, both in connection with the 1997 Coal Supply Agreement ("the CSA"), as well as separate and apart from it, is entitled to benefit from the forum-selection clause not only with regard to matters relating to the CSA, but even with respect to actions completely unconnected to that contract. The majority reaches this conclusion despite the fact that the forum-selection clause is contained in a contract to which Massey was not a party, with which Massey tortiously interfered, and under which Massey never acted in good faith. In so doing, the majority not only deprives the plaintiffs of the substantial damages awarded to them by the rightful finders of fact, a Boone County jury, but also leaves them with no legal recourse by which to address Massey's extensive pattern of fraudulent conduct. It similarly eliminates any recovery for the plaintiffs' numerous creditors in the three pending bankruptcy cases, to whom most of the judgment would have gone. Not least among those creditors are the Harman Companies' union miners who lost their jobs as a result of Massey's fraudulent conduct, and the Harman Companies' hundreds of retirees, to whom the Harman Companies previously paid pensions and medical benefits.[1]

Because the majority unjustly strips Massey's victims of their rightful verdict by creating extensive new law and manipulating the existing law to achieve the end result, I dissent on the following grounds:

- **Forum Selection Clause**—Because much of Massey's *fraudulent* conduct bore no connection to the CSA, the tort claims asserted by the plaintiffs should NOT be governed by the forum-selection clause contained in that contract.

- **Standard of Review**—The new standard of review departs dramatically from extensive prior precedent requiring deference to a circuit court's findings of fact, and supplants this Court as a *de novo* finder of fact.

- **Retroactivity**—The new principles of law relating to the enforcement of forum-selection clauses should NOT be applied retroactively by this Court. Such retroactive application deprives the plaintiffs of any opportunity to present evidence to meet the burden placed on them by the majority's new test and, thus, violates the plaintiffs' due process rights. Moreover, in retroactively applying these new principles to the instant case, the majority makes its own findings of fact, an act which should be reserved for the circuit court. Finally, the majority's announcement of these new principles was not "clearly foreshadowed," and their enforcement produces a substantially inequitable result.

## I. Facts

The plaintiffs in the underlying case, Harman Development Corporation, Harman Mining Corporation, and Sovereign Coal Sales, Inc. (collectively "the Harman Companies"), and Hugh M. Caperton ("Mr. Caperton"), sued A.T. Massey Coal Company, Inc. and several of its subsidiaries (collectively "Massey") in the Circuit Court of Boone County, West Virginia. The Harman Companies alleged, among other things, that Massey engaged in tortious interference with several of the Harman Companies' and Mr. Caperton's existing contracts,[2] and further

1. The Harman Companies' employees and retirees, the United Mine Workers of America ("UMWA"), and the UMWA Health and Retirement Funds are among the largest creditors in the Harman bankruptcy cases, with combined claims exceeding $15.8 million.

2. In its March 15, 2005, Final Order denying Massey's post-trial motions, the circuit court found that

> [t]he evidence was clearly sufficient for the Jury to conclude that Defendants tortiously interfered with the Harman Plaintiffs' advanta-

geous relationships with, among others, the United Mine Workers of America, with Penn Virginia Coal Company, with Terra Industries, Inc., with Grundy National Bank, and with Wellmore Coal Corporation. As for Plaintiff Caperton, the evidence was clearly sufficient for the Jury to conclude that Defendants tortiously interfered with, among others, his personal guaranty relationships with Grundy National Bank, his personal liability under the Terra reclamation bonds ... and his personal relationship with United Bank. Further, the evidence was clearly sufficient for the Jury to

that Massey engaged in fraudulent concealment and made fraudulent misrepresentations in its dealings with the plaintiffs. After a lengthy trial, during which the plaintiffs produced overwhelming evidence of Massey's intentional fraudulent acts, a jury in Boone County awarded the plaintiffs more than fifty million dollars in damages.[3]

Early in the course of that litigation, Massey filed a motion to dismiss based on improper venue, arguing that a forum-selection clause contained in the CSA, a contract between two of the Harman Companies and Wellmore Coal Corporation ("Wellmore"), required that all actions brought in connection with the contract be litigated in Virginia. The Circuit Court of Boone County denied that motion.[4] The majority now reverses, holding that because *one* of Massey's alleged fraudulent acts—its fraudulent declaration of *force majeure*[5]—was performed "in connection with" the CSA, all of the plaintiffs' claims, even those completely unconnected to the CSA, should have been brought in Virginia. In reaching this conclusion, the majority ignores Massey's significant fraudulent acts that were unrelated to the CSA but that culminated in the financial destruction of the Harman Companies and Mr. Caperton. Instead the majority declares that the fraudulent declaration of *force majeure* was *the act* from which *all* of the plaintiffs' damages flowed. This is simply not true. As determined by the fact-finders and fully demonstrated by the record below, **Massey engaged in a web of deceit replete with fraudulent acts, many of which were separate and apart from the declaration of *force majeure*.**

Specifically, the evidence introduced at trial showed that Massey engaged in a wide-ranging scheme to expand the market for its own coal, obtain access to the Harman Companies' valuable coal reserves and eliminate the Harman Companies and Mr. Caperton as competitors from the metallurgical coal market. While aggressive competition and even sharp practice in business dealings is certainly not actionable in and of itself, it becomes actionable when a party engages in fraudulent misrepresentations and fraudulent concealment to achieve those goals.[6] Here, Massey developed a scheme in which it simultaneously disrupted the Harman Companies' existing coal supply contract with Wellmore, thus eliminating the Harman Companies' primary source of revenue, while engaging in fraudulent, bad-faith negotiations with Mr. Caperton for the sale of his interest in the Harman Companies' assets. Through these fraudulent negotiations, Massey lured Mr. Caperton and the Harman Companies into a false sense of security, thereby deterring them from seeking other buyers for their coal. Moreover, Massey actively dissuaded other potential buyers and took steps to ensure that the Harman Companies' reserves would be unattractive to anyone else. Ultimately, after ensuring that Mr. Caperton would be unable to find any

conclude that Defendants engaged in this intentional interference for the specific purpose of financially destroying Plaintiffs, both corporately and personally.

3. With interest, the award due to the plaintiffs would now exceed eighty-five million dollars.

4. Interestingly, no written order denying the motion to dismiss can be found in the Court record, nor was any oral ruling documented in this case. Because throughout the tortured history of this appeal, the parties have agreed that the motion was denied, we must conclude that the lower court at least implicitly denied the motion.

5. The CSA included a *"force majeure"* provision, which permitted either party to suspend its obligations under the contract if one of several specific, uncontrollable events prevented that party from being able to meet its contractual obligations. For example, if either party was pre-

vented from performing under the contract as a result of an act of God, act of public enemy, epidemic, insurrection, etc., then that party could avoid defaulting on its contractual obligations by declaring *"force majeure."*

6. The torts of fraudulent misrepresentation and fraudulent concealment each require that the plaintiff prove:

(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it.

Syl. Pt. 5, in part, *Kidd v. Mull,* 215 W.Va. 151, 595 S.E.2d 308 (2004) (*quoting Horton v. Tyree,* 104 W.Va. 238, 242, 139 S.E. 737 (1927); Syl. Pt. 1, *Lengyel v. Lint,* 167 W.Va. 272, 280 S.E.2d 66 (1981)).

other willing buyers, Massey collapsed the sale negotiations altogether, thereby forcing the Harman Companies and Mr. Caperton into bankruptcy.

In furtherance of this fraudulent scheme, Massey engaged in actions that cannot reasonably be considered to have any "connection with" the CSA. For example:

(1) After Massey expressed a desire to purchase Mr. Caperton's interest in the Harman Companies, *Mr. Caperton, at Massey's request, shared confidential information with Massey relating to his business plans.* Specifically, beginning at a meeting in late November 1997, and continuing through January 1998, Mr. Caperton provided Massey with confidential business information including mine maps, reserve studies, drill information, and, importantly, the Harman Companies' plans to expand into adjoining reserves owned by Pittston Coal Company ("Pittston"). Mr. Caperton also advised Massey of the Harman Companies' debt obligations, including debts for which Mr. Caperton was personally obligated, and advised Massey of the terms of the Harman Companies' lease with Penn Virginia Coal Company ("Penn Virginia"), the owner and lessor of the Harman Companies' coal reserves;

(2) As the negotiations for proposed sale of Mr. Caperton's interest in the Harman Companies continued, Massey represented that it intended to take over the Harman Companies' lease with Penn Virginia "as is," and the parties agreed to close the deal on January 31, 1998. *At Massey's request, Mr. Caperton shut down the Harman Companies' operations on January 19, 1998, in preparation for that closing date.* An internal memo circulated between Massey officers, however, indicated that, unbeknownst to Mr. Caperton, Massey had no intention of closing on the agreed-upon date. Moreover, *Massey knowingly allowed the Harman Companies to continue to believe the January 31, 1998, date would be met,* and allowed Mr. Caperton to shut down operations as planned despite knowing, from the confidential information that it had previously obtained, that such action would have serious financial consequences for both the Harman Companies and for Mr. Caperton, due to his personal guarantees of certain of the Harman Companies' loans;

(3) After refusing to close the deal by the original deadline, Massey continued to intentionally mislead the Harman Companies and Mr. Caperton into believing that an agreement would be reached. Among other things, Massey executed several "letters of intent" to Mr. Caperton and several creditors of the Harman Companies.[7] For example, in a letter dated February 9, 1998, to Mr. Caperton, Massey promised to, among other things, "pursue good faith negotiations" to reach a deal permitting Massey to acquire Mr. Caperton's interest in the Harman Companies;

(4) Two days after this letter, on February 11, 1998, Massey announced that it had sold Wellmore to Black Diamond Company ("Black Diamond"). As part of that sale, *Massey directed Black Diamond not to pursue the acquisition of the Harman Companies, a possibility in which Black Diamond had previously expressed an interest;*

(5) With the plaintiffs still unaware of Massey's true intentions, the parties agreed to a new closing date of March 13, 1998. Hours before the transaction was set to close, and despite Massey's previous assertions that it would accept the Penn Virginia lease "as is," *Massey intentionally collapsed the deal by demanding unreasonable changes to the proposed lease with Penn Virginia.* Those demands included changing the term of the lease, the royalty rate, the mining provisions and the recoupment period. Although Penn Virginia agreed to certain further concessions,

---

7. Mr. Caperton had personally guaranteed many of the Harman Companies' debts, and Massey had promised to assume these debts as part of the deal.

Massey refused to negotiate at all, and the deal crumbled;

(6) After collapsing the deal, *Massey, using the confidential information it had obtained through the sale negotiation process,* purchased a narrow band of coal surrounding the Harman Companies' reserves from Pittston, in order to create a barrier that would prevent any company other than Massey from being able to expand the Harman Companies' operations. Massey's own internal documents acknowledged that this purchase ensured that the Harman Companies' property would be unattractive to any potential buyer other than Massey, thus ensuring that Massey would be able to acquire the Harman property "in the long run," obviously implying after bankruptcy.

None of these acts bore any connection to the CSA. Yet the majority sweeps them under the CSA in a conclusory manner, with no attempt to offer any reasoning or explanation for doing so. Indeed, rather than acknowledge the gravity of Massey's foregoing conduct, the majority, using tunnel vision, focuses solely on the declaration of *force majeure.*

As a result of this conduct, the Harman Companies defaulted on the terms of their lease with Penn Virginia, violated the terms of their contractual obligations to their miners and the UMWA, defaulted on loans to creditors, and ultimately declared bankruptcy. Because Mr. Caperton had personally guaranteed certain loans on behalf of the Harman Companies, he was forced into personal bankruptcy. As a further consequence of Massey's scheme, Mr. Caperton defaulted on land reclamation liabilities under Federal and State environmental laws and, as a result, was entered into the Office of Surface Mining's Applicant Violator System, which effectively prevents him from obtaining any future coal mining permits or otherwise working in a position of authority in that industry.[8]

## II. Enforceability of the Forum–Selection Clause

The majority announces that this case presents the first opportunity for this Court to address substantive issues relating to the enforcement of forum-selection clauses. In so stating, it broadly asserts that this Court has "previously indicated our general approval of forum-selection clauses," because this Court has noted, in dicta contained in a footnote, that such clauses are not contrary to public policy. Specifically, in *General Electric Company v. Keyser*, 166 W.Va. 456, 275 S.E.2d 289 (1981), this Court stated in footnote two:

We have had occasion, however, to discuss, indirectly, forum selection clauses. Although our law on this point is skeletal, it does indicate that contract clauses which affect matters such as jurisdiction and the like should be carefully analyzed.

Unquestionably, forum selection clauses are not contrary to public policy in and of themselves for they are sanctioned in commercial sales agreements under W. Va. Code § 46–1–105(2). Although an early case in our jurisprudence held void a clause in a stock certificate requiring that stockholders bring suit in New York, *Savage v. People's Building, Loan and Savings Association*, 45 W.Va. 275, 31 S.E. 991 (1898), later cases have sanctioned, at least implicitly, forum selection clauses. *Axelrod v. Premier Photo Service, Inc.*, 154 W.Va. 137, 173 S.E.2d 383 (1970). *Board of Education v. W. Harley Miller, Inc.*, W. Va., [159 W.Va. 120] 221 S.E.2d 882 (1975). Both *Axelrod* and *Miller* involved contracts which contained arbitration clauses. In *Axelrod*, we gave full faith and credit to a New York Court decision which confirmed an arbitration award made pursuant to the contract terms requiring arbitration. In *Miller*, we held valid a contract provision which made arbitration a condition precedent to suit in the West Virginia courts. The writer of the *Miller* opinion noted that the common law rule preventing parties from ousting the

---

8. The circuit court noted in its Final Order denying Massey's post-trial motions that Mr. Caperton suffered additional mental anguish due to Massey's trespassing on his personal property and photographing his personal residence.

court of jurisdiction by their agreement was "archaic." 221 S.E.2d at 885.

As the Federal court observed, West Virginia appears not to subscribe to the rule that choice of forum clauses are void per se. "Rather the rule of most jurisdictions and the rule that this Court believes that West Virginia should and would adopt is that such clauses will be enforced only when found to be reasonable and just". *Leasewell, Ltd. v. Jake Shelton Ford Inc.,* 423 F.Supp. 1011, 1015 (S.D.W.Va.1976). *See also, Kolendo v. Jarell [Jerell], Inc.,* 489 F.Supp. 983 (S.D.W.Va.1980).

The factors to be weighed in determining the effectiveness of a forum selection clause are materially different from the factors a court will consider in determining the effectiveness of a choice of laws clause and speak to very different problems. *Leasewell, supra* at 1014. Choice of law clauses, however, are not automatically void either, as they too are sanctioned in commercial transactions by the West Virginia Code. W. Va.Code § 46–1–105(1). Thus it appears that we should not per se invalidate a choice of law clause without analysis anymore than we should invalidate a choice of forum clause without careful scrutiny.

*Id.* at 461 n. 2, 275 S.E.2d at 292 n. 2. An objective reading of this footnote does not support the majority's sweeping conclusion that this Court's prior law indicates "general approval" of forum-selection clauses. Rather, the footnote indicates skepticism of such clauses by requiring that they be "carefully analyzed," and further implies that such clauses should only be enforced where they are "reasonable and just."

Nevertheless, the majority misstates that forum-selection clauses are viewed with favor in West Virginia, and proceeds to adopt a test for determining the enforceability of a forum-selection clause established in *Phillips v. Audio Active Limited,* 494 F.3d 378 (2d Cir.2007). Specifically, the majority sets forth the following four factors for consideration: (1) whether the clause was reasonably communicated to the party resisting enforcement, (2) whether the clause is mandatory or permissive, (3) whether the claims and parties involved in the suit are subject to the forum-selection clause, and (4) whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching. Although at least two of these four new factors obviously require fact-driven determinations, the majority not only adopts these new principles of law out of the blue, it then refuses to give the plaintiffs a chance to present evidence on them and, incredibly, proceeds to make *de novo* findings of fact themselves!

## A. Standard of Review for Forum–Selection Clauses

As an initial matter, I object to the majority's adoption of a completely new standard of review specifically for forum-selection clauses. The majority now holds, without providing any explanation, that "[o]ur review of the applicability and enforceability of a forum-selection clause is *de novo.*" Given that this holding breaks from our existing precedent without justification, I cannot support this decision.

While motions to dismiss based on a plaintiff's failure to state a claim are generally reviewed *de novo, Sturm v. Board of Educ. of Kanawha County,* 223 W.Va. 277, 280, 672 S.E.2d 606, 609 (2008), this Court has held that motions to dismiss based on venue are reviewed for abuse of discretion. Syl. Pt. 1, *United Bank, Inc. v. Blosser,* 218 W.Va. 378, 624 S.E.2d 815 (2005) ("This Court's review of a trial court's decision on a motion to dismiss for improper venue is for abuse of discretion."). As recognized by the majority, motions to dismiss based on forum-selection clauses are motions to dismiss based on venue. Accordingly, by assigning a *de novo* standard of review to motions to dismiss based on forum-selection clauses specifically, the majority breaks with this Court's prior precedent.

More importantly, this Court has long held as a general proposition that

[i]n reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the

ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 2, *Walker v. W. Va. Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997). The new test set forth by the majority for determining whether to dismiss a claim based on a forum-selection clause necessarily requires that courts applying the test make findings of fact as well as determinations of law. Specifically, the first inquiry under the majority's new test is whether "the clause was reasonably communicated to the party resisting enforcement." This element does not require a legal interpretation of the clause itself; rather, it turns solely on a question of fact specific to each individual case. Similarly, the fourth element of the new test requires a court to consider whether the party resisting enforcement of the forum-selection clause has made a sufficiently strong showing that such enforcement would be unreasonable and unjust. Such showing likewise turns on the facts of the particular case, and is not related to the legal interpretation of the contract at issue.

Faced with a similar question concerning what standard to use in reviewing the enforcement of a forum-selection clause, the Supreme Court of Washington acknowledged the nuances associated with reviewing such clauses, and concluded that:

> [G]enerally the abuse of discretion standard applies. Under this standard of review, a trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. If the trial court's ruling is based on an erroneous view of the law or involves application of an incorrect legal analysis it necessarily abuses its discretion. Thus, the abuse of discretion standard gives deference to a trial court's fact-specific determination on enforceability of a forum selection clause,

while permitting reversal where an incorrect legal standard is applied. If, however, a pure question of law is presented, such as whether public policy precludes giving effect to a forum selection clause in particular circumstances, a de novo standard of review should be applied as to that question.

*Dix v. ICT Group, Inc.,* 160 Wash.2d 826, 161 P.3d 1016, 1020 (2007) (internal citations omitted). Thus, while affirming the basic tenet that questions of law are reviewed *de novo,* the Supreme Court of Washington recognized that, even in the context of forum-selection clauses, trial courts should be afforded the typical measure of deference generally granted to their factual findings. This approach is in keeping with this Court's prior precedent and there is no good reason to alter longstanding law to require *de novo* review of a circuit court's findings of fact merely because they relate to the applicability of a forum-selection clause. *See* Syl. Pt. 2, *Walker,* 201 W.Va. 108, 492 S.E.2d 167. Thus, I cannot support the majority's new holding on this issue, as its approach is too simplistic, not in conformity with our longstanding law, and seems designed to achieve an outcome for one specific case.

### B. Scope of the Plaintiff's Claims

The broad language of the forum-selection clause in this case provides that it applies to "all actions brought *in connection with* " the CSA. The facts in this case, however, establish that it was Massey's actions relating to the sale of Mr. Caperton's interest in the Harman Companies—actions that were not related in any way to the CSA—that directly caused the Harman Companies' and Mr. Caperton's complete financial demise.[9] For example, had Massey merely directed Wellmore to fraudulently declare *force majeure,* but done nothing further, it is likely that Mr. Caperton would have found a buyer for the Harman Companies, which would have saved

---

9. By focusing on Massey's actions that were outside the scope of, or not done "in connection with," the CSA, I do not intend to diminish the importance of the fraudulent declaration of *force majeure.* There can be no doubt that Massey used that fraudulent declaration to place the Harman Companies in a financially vulnerable position which forced them to negotiate with Massey. That declaration, however, was not the proximate cause of the damages that occurred in this case, and by focusing solely on it, the majority ignores the importance of the other acts undertaken by Massey.

them from bankruptcy and saved Mr. Caperton from personal financial ruin. Indeed, Black Diamond, the company that ultimately purchased Wellmore from Massey, had previously expressed an interest in purchasing the Harman Companies. Massey, however, prevented any such deal by engaging Black Diamond as a buyer for Wellmore and then ordering Black Diamond not to communicate with representatives of Harman regarding its possible acquisition. Massey's directive to Black Diamond is just one example of an act by Massey that was wholly unrelated to the CSA and, in the absence of which, the Harman Companies may well have avoided bankruptcy.

Similarly, had Mr. Caperton not shut down the Harman Companies' operations in mid-January, in reliance on Massey's fraudulent representations that it intended to close the deal by January 31, 1998, Mr. Caperton and the Harman Companies' financial distress would not have been as urgent or immediate as it was. With a little more time, they could have found another buyer for their extremely valuable coal.[10] As part of its scheme, however, starting in November 1997, Massey consistently led Mr. Caperton to believe that the parties would reach a deal for the sale of Mr. Caperton's interest in the Harman Companies' and, thus, Massey effectively prevented Mr. Caperton and the Harman Companies from seeking other buyers or pursuing other avenues for relief. Clearly, Massey's misrepresentations regarding its intent to reach a sale agreement, as well as its failure to follow through on the agreed-to closing date for this sale, bear no relation to the CSA. The actions did, however, directly lead to the Harman Companies' and Mr. Caperton's declarations of bankruptcy.

Finally, Massey's use of confidential information, obtained during the sale negotiations with Mr. Caperton, to purchase the narrow band of coal reserves surrounding the Harman Companies' mine, provides another example of conduct unrelated to any aspect of the CSA. As admitted by Massey in its own internal documents, this purchase ensured that the Harman Companies' property would

be unattractive to all potential buyers other than Massey. Clearly, such action was yet another aspect of Massey's fraudulent scheme to ensure the Harman Companies' total collapse, and to further Massey's goal of gaining access to the Harman Companies' valuable coal reserves.

Accordingly, the majority is wrong when it concludes that, "in absence of the declaration of *force majeure*, the Harman Companies would not have been forced into bankruptcy and their prospective contractual relationships would not have been impeded by Massey." Rather, the facts indicate that Massey's fraudulent conduct neither began nor ended with that wrongful declaration and that it was Massey's misrepresentations and concealments made in connection with the proposed sale of Mr. Caperton's interest in the Harman Companies that directly caused their demise. The majority, however, makes no attempt to explain why all of Massey's conduct unrelated to the CSA can be characterized as flowing from the fraudulent declaration of *force majeure*. Like many of its other determinations, the majority simply makes conclusory statements without any support or reasoning.

## C. A Better Approach

Importantly, this case involves *fraud*, rather than an act of negligence or straightforward breach of contract. Courts in many other jurisdictions have refused to enforce forum-selection clauses where the plaintiff has asserted claims of wide-ranging *fraudulent* conduct. In such cases, the court considering the forum-selection clause concluded that the "gist" of the asserted claims exceeded the scope of the contract containing the forum-selection clause and, thus, the court refused to allow the defendant to benefit from the clause.

In *Farmland Industries, Inc. v. Frazier–Parrott Commodities, Inc.*, 806 F.2d 848 (8th Cir.1986) (*abrogated on other grounds by Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495, 109 S.Ct. 1976, 104 L.Ed.2d 548 (1989)), the United States Court of Appeals for the Eighth Circuit affirmed a district court deci-

---

**10.** Massey documents acknowledged that the quality of the Harman Companies' coal exceeded

the quality of Massey's own most valuable reserves.

sion that the enforcement of a forum-selection clause would be unreasonable given that not all of the plaintiff's claims arose directly or indirectly from the agreement containing the clause. In that case, plaintiff Farmland Industries, Inc. ("Farmland"), an agricultural cooperative corporation, contracted with the defendants, commodity brokerage firms, to open several commodity futures trading accounts. *Id.* at 849. The contract, which was signed in May 1985, contained a very broad forum-selection clause which bound Farmland to bring any judicial action "arising directly, indirectly, or otherwise in connection with, out of, related to or from this Agreement or any transaction covered hereby or otherwise arising in connection with the relationship between the parties …" in Cook County, Illinois. *Id.*

In its complaint, Farmland alleged that prior to entering into the May 1985 contract, the defendants had engaged in various fraudulent activities, including a kick-back scheme in which several of the defendants would receive money for every closed contract on Farmland's commodities account. Farmland further alleged that the defendants had created a sham corporation to receive the kickbacks, and that some of Farmland's favorable commodities contracts had been transferred to an account set up for the sham corporation. *Id.* After discovering the fraudulent conduct, Farmland filed suit in the District Court for the Western District of Missouri, alleging fraud, breach of fiduciary duty, and violations of several federal statutes, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *Id.* The defendants sought to dismiss the case based on improper venue pursuant to the forum-selection clause. *Id.*

In reviewing the case, the Eighth Circuit concluded that *the scope of the claims raised in the suit was broader than the scope of the forum-selection clause. Id.* at 852. It found that:

> Plaintiff has alleged an elaborate scheme of fraud involving not only Heinold [a party to the contract containing the clause] and individuals associated with Heinold, but also involving other individuals outside the securities brokerages, sham corpora-

tions, and other matters not subject to the agreement between plaintiff and Heinold. *Id.* Thus, the Eighth Circuit agreed with the district court that not all of Farmland's claims arose directly or even indirectly from the contract, and "Farmland could not have anticipated having to litigate these claims in Illinois." *Id.* It further found that "Farmland's multiple claims were not intended to evade the forum selection clause," and that, although some of the claims were directly related to the contract containing the clause, it made no sense to transfer just those claims to the designated forum, thereby mandating the "piecemeal" resolution of the case. *Id.* Consequently, it affirmed the district court's decision.

Similarly, in *Armco Inc. v. North Atlantic Insurance Company Limited,* 68 F.Supp.2d 330 (S.D.N.Y.1999), the district court for the Southern District of New York concluded that a forum-selection clause would not dictate venue in a case in which the plaintiff had alleged a fraudulent course of conduct by the defendants which pre-dated the signing of the clause-containing contract. In *Armco,* the plaintiff asserted common law fraud, conversion, breach of fiduciary duty, and violations of RICO, stemming from an alleged fraudulent scheme associated with the sale of several of its subsidiaries. *Id.* at 333. Prior to the sale, which was designed to be a management buy-out, several of the plaintiffs' employees entered into a secret agreement with the purchasers to eventually become joint-owners of the subsidiaries. *Id.* at 333–34. The plaintiffs alleged that, instead of being the product of an arms-length negotiation, the sale was "part of a wide-ranging conspiracy to defraud Armco and its affiliates out of millions of dollars." *Id.* at 334. They further asserted that the fraudulent conduct commenced before the contract was entered into, and continued after the sale had been completed. *Id.*

The sale contract in *Armco* included a forum-selection clause, stating that "the parties irrevocably submit themselves to the exclusive jurisdiction of the English Courts to settle any dispute which may arise out of or in connection with this Agreement." *Id.* at 338. After the plaintiff initiated suit in the

Southern District of New York, the defendant moved to dismiss asserting improper venue based on the clause. *Id.* at 333. The district court, however, concluded that the action did not "arise out of" or "in connection with" the sale contract. *Id.* at 338. It noted that the plaintiffs were not suing for breach of contract, alleging any lack of performance, or otherwise disputing either party's rights or obligations under the contract, but were instead alleging "a series of fraudulent activities that included the negotiation and execution of the subject Sale Contract." *Id.* Indeed, the action "arose out of the alleged wide ranging fraud, including numerous acts committed before the execution of the Sale Contract." *Id.* Thus, it concluded, *"the 'gist' of plaintiffs' claims is not the breach of a contractual relationship, but the series of acts by defendants resulting in the fraud."* *Id.* at 339 (emphasis added). Importantly, it noted that the signing of the sale contract was "merely one important aspect" of the defendant's fraudulent scheme. *Id.* at 340.

I find the reasoning of the courts in *Farmland* and *Armco* compelling and the better view for this Court to have adopted in the instant case. Similar to the defendants in those cases, Massey engaged in a wide-ranging, fraudulent course of conduct for the purposes of obtaining access to new sources of metallurgical coal and new purchasers for that coal, while eliminating one of its competitors, the Harman Companies, in the process. To that end, Massey engaged in a series of acts, of which the declaration of *force majeure* was "merely one important aspect." *See Armco,* 68 F.Supp.2d at 340. Like the defendants in *Armco,* who initiated their fraudulent plan before the sale contract was signed, Massey developed and initiated its fraudulent scheme prior to fraudulently declaring *force majeure,* and its fraudulent conduct continued after that declaration until it had financially ruined the Harman Companies and Mr. Caperton. Despite the clear evidence of the wide-ranging scope of Massey's fraudulent conduct, the majority concludes that Massey's conduct that was unrelated to the CSA did not, by itself, produce the ultimate injury, and thus it should be disregarded. Under *Farmland* and *Armco,* however, the entire course of conduct should

be considered in determining the scope of the claims.

Underlying the holdings in these cases is the proposition that courts should not reward wrong-doers by allowing them to benefit from contracts with which they have fraudulently interfered. Indeed, it is an immense irony that Massey, in directing the fraudulent declaration of *force majeure,* treated the CSA like it was not worth the paper it was written on. Yet in its now successful effort to wreak corporate and personal financial ruin on the Harman Companies and Mr. Caperton, Massey embraces the contract and its forum-selection clause almost amorously. The majority encourages this behavior by callously allowing Massey to benefit from the contract it sought to destroy.

### III. Retroactive Application of the New Principles of Law

Even if the majority was correct that, under its new law relating to the enforceability of forum-selection clauses, this suit should have been brought in Virginia, it is clearly unjust to enforce the new principles of law in this case, particularly by doing so without remanding the case for application of the new test by the circuit court. Indeed, I am at a complete loss to understand how the majority can allow Massey to benefit-to the tune of more than fifty million dollars plus interest-from a forum-selection clause contained in a contract that Massey actively sought to destroy. That the majority considers the application of the forum-selection clause in this case to be an "equitable result" is beyond comprehension.

#### A. Due Process Violation

As previously discussed, the majority adopts a brand new legal test for determining the validity and applicability of a forum-selection clause, a test which necessarily requires findings of fact. The majority, however, refuses to remand the case for application of the test by the circuit court. Instead, flying in the face of clear precedent, the majority makes its own findings of fact in applying the test, without providing the plaintiffs any opportunity to establish an appropriate evidentiary record. Accordingly, because the plaintiffs did not have a crystal

ball during the early stages of this case, they are precluded from even attempting to comport with the new legal principles set forth by the majority.

It is well-settled that "a State may not deprive a person of all existing remedies for the enforcement of a right, which the State has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it." *Brinkerhoff–Faris Trust & Savings v. Hill*, 281 U.S. 673, 682, 50 S.Ct. 451, 74 L.Ed. 1107 (1930). Nevertheless, that is exactly what the majority has done here. Indeed, by enunciating new principles of law and applying them to the case at hand, instead of remanding the case to the circuit court for further evidentiary analysis, the majority violates the plaintiffs' due process rights.

As stated by former West Virginia Supreme Court Justice Joseph P. Albright, Jr., in his dissenting opinion in this case following the majority's April 4, 2008, opinion:

> [w]hen a new burden is placed on a party as part of that new law and the party charged with carrying the burden is not permitted an opportunity to go forward with evidence to meet that burden, procedural due process guarantees are violated ... There is absolutely no way that the corporate appellees or Mr. Caperton could have heretofore attempted to meet the burden the new standard imposes in order to overcome the presumption of validity. The majority affords no opportunity after announcing the new standard for the affected parties to meet the newly established burden. Obviously, Appellees' rights to due process have been abridged.

*Caperton v. A.T. Massey Coal Co., Inc.*, 223 W.Va. 624, 679 S.E.2d 223, 278–79 (2008) (Albright, J., dissenting). I agree with Justice Albright's assessment that, by depriving the plaintiffs of the opportunity to prove, under the majority's new test, that enforcement of the forum-selection clause in this · case is inappropriate, the majority deprives the plaintiffs of their opportunity to protect their rights and, thus, violates due process principles.

## B. New Retroactive Application Test

The majority now concludes that the existing test for determining when to retroactively apply a newly established principle of law, set forth in *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), is insufficient for the case at hand,[11] because "the *Bradley* test is narrowly confined to deciding whether to retroactively apply a new principle of law that was created in a case that overruled prior precedent." Thus, the majority, relying on the United States Supreme Court's decision in *Chevron Oil Company v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), *overruled by Harper v. Virginia Department of Taxation*, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), now sets forth a new test designed for situations in which the new principle of law addresses an issue of first impression, rather than overturning prior precedent:

> First, we will determine whether the new principle of law was an issue of first impression whose resolution was clearly foreshadowed. Second, we must determine whether or not the purpose and effect of the new rule will be enhanced or retarded by applying the rule retroactively. Finally, we will determine whether full retroactivity of the new rule would produce substantial inequitable results.

In applying this test to the instant case, the majority finds that its new principles of law relating to forum-selection clauses were "clearly foreshadowed," that the purpose of the new principles is furthered by applying them retroactively, and that retroactive application is not inequitable.

The majority's application of its new retroactivity test to the instant case, however, is arbitrary and unjust. Indeed, when applied to this case, even the new test clearly weighs *against* retroactive application. Not only are the majority's new principles of law relating to forum-selection clauses not "clearly foreshadowed," enforcement of these new principles plainly produces a "substantially inequitable result."

---

**11.** Remarkably, in every instance that existing law and longstanding precedent stood in the way of the result reached by the majority, it simply altered the law accordingly.

### 1. Decision Not "Clearly Foreshadowed"

According to the majority, whether the *resolution* of a new principle of law has been "clearly foreshadowed" turns solely on whether a party should have known that the Court *might address* the issue of first impression. Thus, in the majority's view, the presence or absence of "clear foreshadowing" applies only to whether the Court may decide to resolve the issue at all and no foreshadowing is necessary of what the actual new law might be.[12]

To this end, the majority, quoting an intermediate appellate court from Michigan, holds that "[a]ll that is required is some indication by a prior decision of this Court or a national trend that would 'put persons on notice that [this Court] could resolve the issue either way[.]'" *Collins v. Dept. of Corr.*, 167 Mich. App. 263, 421 N.W.2d 657, 659 (1988). It then finds "clear foreshadowing" in this Court's prior pronouncement, made more than twenty-eight years ago, in the footnote in *Keyser* that indicated that "contract clauses which affect matters such as jurisdiction and the like should be carefully analyzed." 166 W.Va. at 461 n. 2, 275 S.E.2d at 291 n. 2.

It is absurd for this Court to find that dicta contained in a nearly thirty-year-old footnote that merely advised courts considering contract clauses on "jurisdiction and the like" to analyze them carefully, *clearly foreshadows* the majority's complete overhaul of this Court's law relating to forum-selection clauses. This is particularly absurd given the context of this case, in which the party seeking to enforce the clause engaged in a wide-ranging fraudulent scheme resulting, in part, in the fraudulent breach of the contract containing that clause.[13] Moreover, this Court has specifically de-emphasized placing any importance on language contained in footnotes, stating that "language in a footnote generally should be considered obiter dicta which, by definition, is language 'unnecessary to the decision in the case and therefore not precedential.' Black's Law Dictionary 1100 (7th ed.1999)."[14] *State ex rel. Medical Assurance of West Virginia, Inc., v. Recht*, 213 W.Va. 457, 471, 583 S.E.2d 80, 94 (2003). Thus, the majority's finding that the *Keyser* footnote provides the "clear foreshadowing" necessary to retroactively apply the new legal principles announced in this case is simply another example of how the majority blatantly manipulates the law to achieve its desired outcome.

I additionally find no support for the majority's interpretation of foreshadowing in the case on which it primarily relies, *Professional Insurance Corp. v. Sutherland*, 700 So.2d 347 (Ala.1997). In *Sutherland*, the Alabama Supreme Court *overruled prior*

---

**12.** Taken to its logical conclusion, under the majority's interpretation, *every* unresolved area of law would be "clearly foreshadowed" because the public should expect that issues of first impression will be, by there very nature, addressed by this Court when raised for the first time. Clearly, such interpretation renders the first element of this test superfluous and the concept of foreshadowing meaningless.

**13.** A more reasonable interpretation of *Keyser's* footnote comes from a reading of its complete text, in which the Court indirectly indicates that courts in West Virginia will only enforce forum-selection clauses when such enforcement is "found to be reasonable and just." *Id.* at 461 n. 2, 275 S.E.2d at 292 n. 2. (*quoting Leasewell, Ltd. v. Jake Shelton Ford Inc.*, 423 F.Supp. 1011, 1015 (S.D.W.Va.1976)).

**14.** As the Court further explained in *Doe,*
[d]icta is defined by Black's Law Dictionary as:
Opinions of a judge which do not embody the resolution or determination of the specific case before the court. Expressions in court's opinions which go beyond the facts before court and therefore are individual views of author of opinion and not binding in subsequent cases. *State ex rel. Foster v. Naftalin*, 246 Minn. 181, 74 N.W.2d 249. Black's Law Dictionary 454 (6th ed.1990); *see* 20 Am.Jur.2d *Courts* § 39 (defining dicta as "expressions of opinion which are not necessary to support the decision reached by the court"). The phrase, "obiter dicta," which translates to "a remark by the way," is often shortened to just dicta and similarly references those comments or observations of a judge regarding a point that is incidental or collateral to the direct issue before the court or upon an analogous point introduced by way of illustration but not necessary to the determination of the instant case. *See* Black's Law Dictionary 1072 (6th ed.1990).
210 W. Va. at 494–95, 558 S.E.2d at 294–95 (footnote omitted).

*precedent* holding that "outbound" [15] forum-selection clauses were *per se* void. In retroactively applying its new rule upholding such clauses to the case before it, the court stated that the parties should have been forewarned that it would re-consider this prior precedent because of an "overwhelming" national trend to enforce such clauses, initiated by the United States Supreme Court decision in *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). *Id.* at 352. The Alabama Supreme Court concluded:

> That nationwide trend foreshadowed our adoption today of the rule that such clauses are not per se void, providing notice that Alabama might follow suit and thereby reducing the reliance these plaintiffs could reasonably have placed upon the continued viability of the traditional rule in Alabama.

*Id.*

Contrary to the majority's assertion, the "foreshadowing" that the Alabama Supreme Court relied on for applying the new rule retroactively did not merely alert the parties to the fact that the court may overrule prior precedent on the issue, but clearly pointed to the new rule that would be adopted. Indeed, as the Alabama Supreme Court noted, only three other states still held the view that "outbound" forum selection clauses are *per se* invalid and unenforceable, and two of those so held because of their interpretation of state statutes. *Id.* at 350. Thus, the national trend described in *Sutherland* not only foreshadowed the court's inclination to re-address prior precedent, but also provided a clear indication of what the new rule adopted by that court would be.

A second case cited by the majority, *Founder v. Cabinet for Human Resources*, 23 S.W.3d 221, 224 (Ky.Ct.App.1999), provides another good example of foreshadowing. In *Founder*, the Court of Appeals of Kentucky retroactively applied a decision of the Kentucky Supreme Court in *Vaezkoroni v. Domino's Pizza, Inc.*, Ky., 914 S.W.2d 341 (1995), to Founder's case, even though Founder had filed his suit prior to the decision in *Vaezkoroni. Id.* at 224. The court of appeals concluded that Founder should have been on notice that the law in this area would change, because the holding of *Vaezkoroni* had been clearly foreshadowed by a prior opinion of that court. *Id.* That prior opinion had narrowed the previously existing precedent, and pointed in the direction that the *Vaezkoroni* opinion then confirmed. *Id.* Thus, the court of appeals held that retroactive application was appropriate in that case. Once again, the foreshadowing that existed in *Founder* not only indicated that the Court would address a particular area of law, but further pointed in the direction the new law would go.

This Court has itself properly applied the foreshadowing test when previously addressing retroactivity under *Bradley*, 163 W.Va. 332, 256 S.E.2d 879. For example, in *Richmond v. Levin*, 219 W.Va. 512, 518, 637 S.E.2d 610, 616 (2006), this Court applied the *Bradley* test and concluded that a particular holding had been clearly foreshadowed because:

> The prior decisions of this Court clearly establish that we have not permitted the legislature to enact statutes that are inconsistent with and governed by rules promulgated under our Rule–Making authority. Consequently, it should have been reasonably foreshadowed that this Court would invalidate the jury requirements of W. Va. Code § 55–7B–6d, because those requirements conflicted with the Rules of Civil Procedure.

Thus, the new rule announced in *Richmond* was clearly foreshadowed because this Court's prior holdings "clearly" indicated the direction in which the Court was moving with regard to that particular area of law.

In the case at hand, however, no prior decisions of this Court provide any foreshadowing whatsoever that this Court would be adopting any new legal principles relating to forum-selection clauses, much less those that have been adopted in this case. To say that

---

**15.** The Alabama Supreme Court in *Sutherland* defined an "outbound" forum selection as "one providing for trial outside of Alabama, while an 'inbound' clause provides for trial inside Alabama." *Id.* at 348 n. 1.

the majority's new test was "clearly fore-shadowed" requires great poetic license and a true stretch of the imagination.

### 2. Application Creates Substantially Inequitable Results

I vehemently disagree with the majority's conclusion that no "inequitable result" ensues from applying its new principles of law to the suit at issue. A jury, after considering all the evidence relating to the *merits* of the case, found Massey guilty of tortiously inter-fering with the plaintiffs' existing contracts, as well as making fraudulent misrepresenta-tions and engaging in fraudulent conceal-ment. It awarded the plaintiffs more than fifty million dollars in damages. As previously stated, much of that verdict would have gone to repaying the Harman Companies' creditors, who were also victims of Massey's conduct. To reverse such a verdict on the basis of a circuit court's decision on *venue— an issue wholly unrelated to the merits of the case*—cannot be fair or equitable, particularly without having given the plaintiffs an opportunity to prove, under the new princi-ples of law, that the forum-selection clause in this case should not have been enforced. This injustice is further exacerbated by the fact that the applicable statutes of limitations prohibit the Harman Companies and Mr. Caperton from bringing their claims in Virginia, where the majority now holds they should have been brought. Thus, the plaintiffs are left without **any** recourse against Massey's illegal behavior.

In support of its conclusion that retroac-tive application of the new legal principles is equitable in this case, the majority merely states that "there is no evidence in the record to show that the forum-selection clause involved in this case was not freely bargained for by the actual signatories to the agree-ment." This incredibly narrow and result-oriented view of what makes the retroactive application of a new point of law "inequita-ble" is very troubling. The majority once again refuses to consider the fact that Mas-sey was being sued because of its *fraudulent course of conduct,* one important element of which was its breach of the very contract

that contained the forum-selection clause. *To allow a party that engages in such fraud-ulent behavior to then benefit from the con-tract that it sought to destroy is the very definition of inequitable.* Accordingly, "sub-stantial inequitable results" are produced by the retroactive application of the majority's new legal principles and the new law should not be retroactively enforced in this case.

### IV. Conclusion

In sum, because Massey engaged in a wide-ranging fraudulent scheme to destroy the Harman Companies and Mr. Caperton for its own financial gain, and because many of the acts engaged in by Massey to further that scheme bore absolutely no relation to the CSA, legal claims based on those acts should not be controlled by the forum-selec-tion clause. Furthermore, under *Farmland* and *Armco,* even claims that partially relate to the fraudulent declaration of *force maj-eure* should be exempt from the forum-selec-tion clause, because, given the wide-ranging scope of Massey's conduct in furtherance of that scheme, the "gist" of the plaintiffs' suit exceeds the scope of the CSA. For these reasons, the forum-selection clause should not be enforced in this case.

Furthermore, the majority's new standard of review is inappropriate, given that its new test for determining the enforceability of fo-rum-selection clauses requires findings of fact. Where a circuit is asked to make factu-al determinations, this Court should afford those determinations the deference tradition-ally given. Incredibly, the majority not only fails to give deference, but chooses to make those findings of fact itself by applying its new forum-selection clause test in this case and, in doing so, it deprives the plaintiffs of their due process right to present evidence to establish that the forum-selection clause should not be enforced.

Thus, I oppose the majority's decision to retroactively apply the new principles of law relating to forum-selection clauses, a decision that deprives the plaintiffs and other victims of Massey's conduct of any possible redress. Indeed, even under the majority's newly stat-

ed retroactivity test, retroactive application is inappropriate in the instant case because the majority's new principles of law were not "clearly foreshadowed," and applying them to this case produces a "substantial inequitable result." For these reasons, I respectfully dissent.